THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MANFRED OHRENSTEIN, HOWARD BABBUSH, FRANCIS SANZILLO and JOSEPH MONTALTO, Respondents.

In the Matter of MANFRED OHRENSTEIN et al., Petitioners, v ROBERT M. MORGENTHAU, as District Attorney, New York County, et al., Respondents.

First Department, December 21, 1989

### APPEARANCES OF COUNSEL

*Michael G. Cherkasky* of counsel *(Mark Dwyer, Daniel J. Castleman, Joseph J. Dawson, Mary C. Farrington* and *Morrie I. Kleinbart* with him on the briefs; *Robert M. Morgenthau, District Attorney,* attorney), for appellant on the appeal and for Robert M. Morgenthau, respondent *pro se* in the article 78 proceeding.

*Jack S. Hoffinger* of counsel *(Leon B. Polsky, Stephen L. Weiner* and *Mark W. Geisler* with him on the briefs; *Hoffinger Friedland Dobrish Bernfeld & Hasen,* attorneys), for Manfred Ohrenstein, respondent.

*Otto G. Obermaier* of counsel *(Obermaier, Morvillo & Abramowitz, P. C.,* attorneys), for Francis Sanzillo, respondent.

*Martin B. Adelman, P. C.,* for Joseph Montalto, respondent.

*Pascarella, DeVito, Clarey & Plutzer* for Howard Babbush, respondent.

*Edward N. Castikyan* of counsel *(Steven E. Landers* and *Robert Ernst* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for New York State Assembly, *amicus curiae.*

*Paul J. Curran* of counsel *(Jane W. Parver* and *Thomas F. Ford* with him on the brief; *Kaye, Scholer, Fierman, Hays & Handler,* attorneys), for New York State Senate, *amicus curiae.*

*Arthur Eisenberg* for The New York Civil Liberties Union, *amicus curiae.*

**OPINION OF THE COURT**

Per Curiam.

The People appeal from an order of Justice Harold Rothwax, Supreme Court, New York County, dated June 15, 1988, which dismissed 265 of the substantive counts, and struck certain language and 89 overt acts from the conspiracy count, from an indictment charging the various defendants with a total of 665 counts (139 Misc 2d 909). The defendants against whom the appeal is taken are Senator Manfred Ohrenstein, the Minority Leader of the New York State Senate, his chief of staff, Francis Sanzillo, Howard Babbush, a State Senator from Brooklyn, and Joseph Montalto, a former State Senator from that borough. In a second order, dated July 27, 1988, Justice Rothwax upheld the balance of the indictment. In what is essentially a cross appeal, defendants seek relief pursuant to CPLR article 78, in the nature of mandamus and prohibition. The petition seeks to prevent the District Attorney of New York County from prosecuting and Justice Harold Rothwax from trying the defendants under that indictment which variously charges them with conspiracy, grand larceny, and offering false instruments for filing.

The indictment is based upon the premise that utilization of legislative aides in State senatorial campaigns prior to 1987 constituted an impermissible use of State employees and that payments of salaries out of the legislative budget for services rendered by such aides in political campaigns constituted violations of general Penal Law provisions relating to theft, fraud and filing of a false instrument. Defendants challenge the applicability of these penal statutes to legislative campaigning. They assert that this prosecution impermissibly intrudes into constitutionally protected areas affecting the separation of powers and responsibilities among the three coordinate branches of the State government and violates the constitutional privileges of the Legislature and its members under the Speech or Debate Clause. Arguments are also raised regarding the lack of clarity and certainty on the issues underlying this prosecution which implicate due process considerations of "notice".

■ Contrary to the position taken by the People and the dissent, we find that article 78 relief is available to defendants in this case. Prohibition is allowed when a court acts " 'without jurisdiction in a matter over which it has no power over the subject matter or where it exceeds its authorized

powers in a proceeding over which it has jurisdiction' ". *(Matter of Steingut v Gold,* 42 NY2d 311, 315; *also see, Matter of Carey v Kitson,* 93 AD2d 50, *lv denied* 60 NY2d 553.) Where one branch of government oversteps another coordinate branch's functions, a writ of prohibition may be issued. *(See, Matter of Vergari v Walsh,* 90 AD2d 801.) Moreover, an article 78 proceeding is generally proper to determine whether a statute has been applied in an unconstitutional manner *(Matter of Kovarsky v Housing & Dev. Admin.,* 31 NY2d 184, 191). In this case where there are issues of separation of powers concerning whether a coordinate branch of government exceeded its authorization, and issues raised as to constitutional violations in the application of various criminal statutes, we conclude that this article 78 proceeding is an appropriate vehicle for seeking relief.

The charges are predicated on allegations that prior to the November 1986 general election, by reason of attempts by New York State Senate Minority Leader Manfred Ohrenstein to secure a Democratic majority in the Senate,[1] there existed a conspiracy among the various defendants and others to commit the felonies of grand larceny and offering a false instrument for filing by using legislative employees paid from the Senate budget to work on election campaigns on behalf of various Democratic candidates while performing either no legislative duties or only some legislative duties. The various substantive charges are based on allegations that the defendants falsely certified that these employees had performed legislative duties entitling them to receive salaries when, in fact, no such services were performed.

To place these charges in perspective a brief description of the way in which the State Senate operates is helpful.

The New York State Senate, in Albany, is presided over by the Majority Leader who is a Senator from the party which holds the majority of the seats in that body and who sets the legislative agenda and controls the legislative commissions. In 1986, the Majority Leader was a Republican chosen from among the 35 Senators from that party. The Minority Leader selected from among the 26 Democratic members was Senator Ohrenstein, who had held that position since the early 1970's. Regular legislative sessions are held from January to June, and at times a Special Session near the end of the year. A

---

1. A Democratic majority would likely have resulted in Ohrenstein becoming Majority Leader.

Senator's working times are erratic, with hours varying according to whether it is the early or latter part of the session. In the early days of the session, activity is relatively slow and Senators may not spend a full week in Albany. In March, extensive activity takes place relating to the budget due to time constraints.[2] During the final days of the session, Senators and their staffs will often work endless hours and throughout the night with respect to the enactment of legislation.

The Senate budget, which is distributed along party lines, is negotiated between the Minority and Majority Leaders. The Minority Leader then allocates funds to each of the Senators from his party to be used to meet office and administrative expenses including staff salaries and mailing costs. Within the budget he or she has been allocated, each Senator determines the titles, salaries, working hours and vacation time of that Senator's employees.

A Senator who is assigned to a commission is entitled to additional staff. The appointment of minority Senators to such commissions is made by the Minority Leader, and his office is also responsible for hiring minority staff employees for the commissions and designating their titles. Francis Sanzillo, who had been Senator Ohrenstein's chief of staff since 1984, was the person charged with reviewing and approving the hiring of these employees from that time on, subject to Senator Ohrenstein's approval.

Although the Senate has no uniform policy regarding job descriptions or working hours, which are left to the individual Senator, there are procedures for placing a person on the payroll. A person may be employed for a session, or for the year, and it is not uncommon for employees hired on a session basis to change payrolls from one session to the next. At the beginning of every session each Senator must file a form entitled "Recommendation for Employment" for each member of his staff. This form, signed by the Senator, indicates the employee's name and title and upon its submission to the Senate personnel office, the person is placed on the payroll. For those employees to be paid, the Senator must submit to the Senate payroll office biweekly payroll certification forms. These forms include a payroll list specifying the employees on

---

2. Article VII, § 2 of the NY Constitution requires the Governor to submit a proposed budget at specified times prior to the end of the fiscal year. March 31st ends the fiscal year. (State Finance Law § 3.)

the Senator's staff with their titles, biweekly salary amounts and whether the particular employee was hired on a session or annual basis. The payroll list concludes with the certification that the person in the position specified performed the duties of that position.[3] The Senator may assign a member of his staff to sign the certification forms so long as the Senator signs at least one certification quarterly.

For minority staff employees on commission payrolls, the Minority Leader or his representative, in this case Sanzillo, prepares the certifications which are sent to the commission chairperson, a Senator of the majority party. The commission chairperson transmits these certifications to the Senate payroll office. The payroll office prepares a master payroll of all Senate employees which is submitted to the State Comptroller who in turn issues the checks. The checks are transmitted to the Senate payroll office for distribution to the named employees on a biweekly basis. These payroll certifications, for particular Senators' staffs and for commission employees, are the basis of the offering a false instrument for filing counts in the indictment.

As a result of Senator Ohrenstein's position as Minority Leader, he had by 1986 accumulated a very sizeable staff and his office had become the center for coordinating Democratic strategy with respect to legislation in the Senate. While some of Ohrenstein's staff worked on research and the drafting of bills and the providing of constituent services to his district, the greater part of his staff served as staff to the Senate Minority Conference. The Conference's function is to formulate a united and cohesive plan of legislation for the Democratic Senators, and also to aid new Senators in establishing local district offices and in generally familiarizing them with Senate procedures. Often staff employees from the Minority Leader's office would be permanently assigned to another minority Senator's individual staff without switching payrolls.

As Minority Leader, Senator Ohrenstein's staff is composed

---

3. Content of payroll certification:

"To the Senate Majority Leader: This is to certify that the persons named in the payroll listed above are employed by the New York State Senate in the position specified and have actually performed the *proper duties of the position* for the period described. I further authorize the mailing of checks to employees listed under Mailing Authorization. I affirm that the certification is correct.

"_____

Senator/Dept. Head's Signature Date" (emphasis added).

of essentially four groups: the district office, program, commission, and local coordinating staffs. The district office is the liaison between Ohrenstein and his constituents; the program staff is supervised by the Senate Minority counsel staff to formulate legislative programs for the Minority Conference; commission staff are assigned to the various legislative commissions; the local coordinating staff can be characterized as the "political operation" of the Senate Democrats. The coordinators, usually annual employees, are divided between the upstate and downstate regions. They act as liaisons between the local districts and the Conference. Coordinators are assigned to districts where there is a Republican incumbent or where a Democratic incumbent is weak. The coordinators in these districts try to develop politically beneficial legislative program and assist political campaign strategists by preparing a "profile book" that would be helpful to Democratic candidates. This book contains voting patterns, an incumbent's history on legislative voting, poll results, the names of local leaders and the like.

The Minority Conference operates in two major areas— legislative and political. These parallel functions are each supervised by a "steering committee" composed of Democratic Senators. Although membership on the steering committees is not identical, the Minority Leader, Senator Ohrenstein, heads both. The legislative steering committee's efforts are directed to implementing the Democratic Conference's legislative agenda. It is, however, the political steering committee, which is involved with supervising Democratic senatorial campaigns, that is of particular relevance, in the context of this case.

As indicated, Senator Ohrenstein is the head of the political steering committee and Francis Sanzillo, his deputy, had been in charge of its operations since 1982. The political steering committee oversees Democratic campaigns for the State Senate and targets certain districts for particular attention. When these districts are selected, the political steering committee promulgates campaign strategy and is involved in setting the campaign budget, approving the campaign manager and receiving reports on the progress of the campaign.

In addition to its ability to assign staff to work on specific campaigns, the Minority Conference political steering committee also has control over the funds of the Senate Democratic Campaign Committee (SDCC), a group which is the campaign finance organization of the State Democratic Party relative to State Senate campaigns. Sanzillo, as the person in charge of

the Conference political operations during the time in question, determined who received campaign funds from SDCC and how much. The SDCC funds which candidates receive are in addition to those raised by their individual campaigns. Since the inception of the Minority Conference in the 1970's, Conference staff had regularly participated in campaign and SDCC fund-raising activities.

The majority of the counts in the indictment refer to legislative employees assigned to work on the major campaigns targeted by the Minority Conference political steering committee in 1986. These employees were conveniently grouped by Judge Rothwax as follows:

Category 1—10 people who had been on the Senate payroll prior to the campaign and were loaned out, on a full-time basis, to assist various Democratic candidates during the campaign while remaining on the Senate payroll.

Category 2—8 people placed on the Senate payroll who were hired to work on the 1986 campaign and were thereafter retained to work in the 1987 legislative session.

Category 3—18 people on the Senate payroll who were hired to work on the 1986 campaign and were removed from the payroll at the end of the campaign.

Category 4—3 persons on the payroll who did not render services of any type and who are classified as "no-shows".

There are individuals included in the foregoing who are the subject of counts that fall outside of the time periods specified in their categories. Arlene Wolff was placed on the Senate payroll for the period from January 1, 1981 to October 20, 1982 during which she did fund raising for the SDCC. Barbara Zebersky, who was also involved exclusively in fund raising, but for individual campaigns, was hired in April 1984 as part of the Minority Conference staff. The periods of her employment, that are the subject of counts in the indictment, precede and overlap with those in the above-enumerated categories. These periods are April 19, 1984 through January 9, 1985; January 10, 1985 through January 8, 1986 and January 11, 1986 through December 31, 1986.

Individuals also falling outside of the 1986 campaign time period are persons classified as "no-shows" (Category 4). These are persons who were placed on the payroll but did not render any services at all, either campaign or legislative. They include Joseph Walsh, who was placed on the district office payroll for the period of June 2, 1983 to July 9, 1986, and

Arnold Smith who was on the payroll from September 19, 1985 to January 8, 1986 and from January 9, 1986 to July 24, 1986. The indictment further alleges that for the period from July 14, 1983 to April 18, 1984, Barbara Zebersky fell into this category. She had been working for Senator Babbush, who, in July 1983, told her not to report for work. She reported approximately two times a week until sometime in September, when she ceased attending at all. However, throughout the above time period, Senator Babbush continued to sign payroll certification forms for her.

Carmen Del Priore was not placed in Category 4 by the court because she was hired within the context of the Montalto campaign and therefore was classified in Category 3. However, a review of the Grand Jury testimony demonstrates that she did no work and should be grouped with the other "no-show" employees. When placed on the payroll she was given the title "Administrative Assistant to the Minority". Her employment, which began August 21, 1986, was terminated effective November 12, 1986.

The original indictment charged the existence of a conspiracy (Penal Law § 105.05) among the defendants between January 1, 1986 and January 1, 1987, to commit the felonies of offering a false instrument for filing in the first degree (Penal Law § 175.35) and grand larceny in the first and second degrees. (Penal Law former §§ 155.35, 155.40.) In addition to the conspiracy count, the original indictment contained 613 substantive counts of offering a false instrument for filing, 44 counts of grand larceny, six counts alleging theft of services (Penal Law § 165.15 [9]) in that the labor of employees was diverted to the use of political candidates. A final count charged all defendants except Senator Quattrociocchi with defrauding the government (Penal Law § 195.20 [eff Nov. 1, 1986]) in that from November 1, 1986 to December 24, 1986, they obtained property from the State by a scheme to defraud.

The conspiracy count generally refers to the 1986 State senatorial campaign, while however, the substantive counts cover time periods between 1981 and 1986.

Senator Ohrenstein was charged in a total of 581 of the false instrument counts. He was charged jointly with Francis Sanzillo in 511 of those counts as well as in 36 counts of grand larceny and in the six counts of theft of services. He and Sanzillo were also charged jointly with Senator Babbush in 12 false instrument counts and in a single count of grand larceny

in regard to the employment in 1986 of Clifford Wilson. Additionally, he and Sanzillo were charged together with Joseph Montalto in 12 false instrument counts and in two grand larceny counts in connection with Montalto's 1986 campaign. Ohrenstein was further charged separately in 46 of the false instrument counts, and in one count of grand larceny in regard to the employment of Arlene Wolff.

In addition to the foregoing, Francis Sanzillo was charged individually in one grand larceny count with regard to the 1986 employment of Glenn Van Brauner, and Senator Babbush was individually charged in 20 false instrument counts and one count of grand larceny with regard to the employment of Barbara Zebersky.

All counts in which Senator Quattrociocchi was charged were dismissed and the People are not appealing the dismissal of the portions of the indictment pertaining to him.

Trial Term granted, in part, defendants' motion to dismiss the indictment by dismissing 265 of the 665 counts (139 Misc 2d 909). In upholding the remainder of the indictment, the court held that hiring and paying legislative employees to do no work, or to perform only campaign work for a candidate, does not constitute a legislative act within the meaning of the Speech or Debate Clause, nor is a prosecution based on payment of State funds to such employee rendered nonjusticiable under the "political question" doctrine.

The counts dismissed by the trial court related to employees who had also performed noncampaign legislative work while assigned to senatorial campaigns or who had been on the Senate payroll prior to the election campaign (Category 1) or who had been hired for the campaign but were thereafter retained for the 1987 legislative session (Category 2). In addition, the court dismissed the count of defrauding the government (Penal Law § 195.20) which was based on the vacation period given to employees after the 1986 election and the six theft of services (Penal Law § 165.15) counts. It is from these dismissals that the People appeal, while the defendants, in their petition, seek dismissal of the balance of the indictment.

The People and the dissent contend that the court erred (1) in holding that, under the Speech or Debate Clause, the performance of some legislative acts by certain Senate employees precluded prosecution of the defendants for what is claimed to be larcenous conduct involving those employees and (2) in ruling that the question of whether certain other

legislative employees were improperly engaged in campaign activities is a nonjusticiable political question which cannot be litigated without the judiciary infringing on the prerogatives of a coordinate branch of government. The People essentially argue that the payment to legislative employees for work done in senatorial campaigns was per se illegal and subject to criminal prosecution.

Defendants take the position that the conduct complained of by the People is not criminal and that the People's contrary assertion requires such a tortured construction of the law that, were it to be adopted, it would defeat the constitutional requirements of certainty and clarity embodied in the due process concept of "notice". Defendants further claim that, by attempting to criminalize their activities, the People are impermissibly intruding into the Legislature's affairs in violation of the doctrine of separation of powers and of the Speech or Debate Clause.

We turn first to defendants' argument that this prosecution in its entirety intrudes into the legislative sphere in violation of the separation of powers and the Speech or Debate Clause.

■ We conclude, as did the trial court after a careful and thorough analysis, that the latter clause is of limited application to this case. Article III, § 11 of the NY Constitution, commonly referred to as the "Speech or Debate" Clause, states that "For any speech or debate in either house of the legislature, the members shall not be questioned in any other place". An identical provision is contained in the United States Constitution. (US Const, art I, § 6, cl 1.)

The purpose of the clause is to protect the integrity of the legislative process. A legislator's speech within the confines of his official duties should not be inhibited because of a fear of litigation. *(Oates v Marino,* 106 AD2d 289; *see, Gravel v United States,* 408 US 606.) Legislators are to be protected not only from the consequences of litigation results, but from the burden of defending themselves. *(Eastland v United States Servicemen's Fund,* 421 US 491, 503.)

As interpreted by the United States Supreme Court, the provision is not intended to confer a general exemption upon legislators from liability or from process in criminal cases, but is, rather, directed to matters which "must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of

proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House". That court has further indicated that the privilege has been extended by courts "to matters beyond pure speech or debate in either House, but 'only when necessary to prevent indirect impairment of such deliberations' ". *(Gravel v United States, supra,* at 625, citing *United States v Doe,* 455 F2d 753, 760.)

The privilege has been expanded to include legislative personnel where the employees' duties are directly related to the due functioning of the legislative process. "Thus, if the employee's duties are an integral part of the legislative process, such that they are directly assisting members of Congress in the 'discharge of their functions,' personnel decisions affecting them are correspondingly legislative and shielded from judicial scrutiny." *(Browning v Clerk, U. S. House of Representatives,* 789 F2d 923, 929, *cert denied* 479 US 996.)

While it is recognized that legislators necessarily engage in many activities beyond the purely legislative and that there are many legitimate errands of a political nature that have come to be expected of them such as assisting and working with constituents, meeting with other governmental agencies, obtaining governmental contracts, preparing news releases, making speeches and sending newsletters to constituents, activities of this type have been held not to be covered by the protection afforded by the Speech or Debate Clause. *(United States v Brewster,* 408 US 501, 512.)

In the instant case, there was evidence presented to the Grand Jury that Senate employees Patrick Prefetti and Ingrid Stettner prepared a report for the Senate Dairy Commission in October 1986, which falls within the period covered by the indictment, and that Mary Rose Stevenson, during September and October 1986, arranged a legislative hearing on tax issues. These activities clearly fall within the ambit of legislative acts that are covered by the Speech or Debate Clause *(Gravel v United States, supra,* at 624; *Hutchinson v Proxmire,* 443 US 111, 133).

The indictment cannot be legally sufficient if it is based on Grand Jury testimony which may require inquiry into legislative acts or the motivation for legislative acts. *(United States v Brewster, supra.)* Although the general rule is to view the Grand Jury evidence in the light most favorable to the People, that rule does not apply where the constitutional rights

protected by the Speech or Debate Clause are affected. *(United States v Helstoski,* 442 US 477, 488-492.) When it is apparent that legislative employees have performed legislative acts, the Speech or Debate Clause prevents inquiries, " 'even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes.' " *(Eastland v United States Servicemen's Fund,* 421 US 491, 510, *supra,* citing *Doe v McMillan,* 412 US 306, 312-313.) The obligation is on the prosecutor to show that no privileged legislative act would be implicated, since imposing that obligation on the defendant would violate the intent behind the Speech or Debate Clause of protecting legislators, who are performing legislative acts, from the necessity of defending themselves. *(United States v Helstoski,* 442 US 477, *supra; Eastland v United States Servicemen's Fund, supra,* at 503; *Doe v McMillan, supra.)*

In this case the trial court properly found that the People failed to meet their obligation of showing that the prosecution with respect to the counts relating to Prefetti, Stettner and Stevenson could proceed without touching upon the specifics of their privileged legislative assignments. Accordingly, the dismissal of those counts, involving Prefetti and Stettner, on speech or debate grounds, is affirmed, no appeal having been taken from the dismissal of counts regarding Stevenson.

■ While the People and the dissent take issue with the foregoing conclusion, they argue that, in any event, "the Speech or Debate Clause completely meets all of the separation of powers concerns implicated by a prosecution against a legislator". We disagree. As recognized by the trial court, the separation of powers doctrine is not contiguous with the Speech or Debate Clause but has a far broader reach. The People and dissent's position ignores the basic policy which requires "the exercise of a proper restraint on the part of the judiciary in responding to invitations to intervene in the internal affairs of the Legislature as a co-ordinate branch of government—'it is not the province of the courts to direct the legislature how to do its work' ". *(New York Pub. Interest Research Group v Steingut,* 40 NY2d 250, 257.) In seeking to restrict and limit the privileged sphere of legislative powers only to those acts covered by the Speech or Debate Clause they ignore prior judicial recognition and acknowledgment that there are many activities of legislators, concededly not covered by the Speech or Debate Clause, which quite properly and necessarily fall within the ambit of a legislator's work

*(United States v Brewster, supra,* at 512) and which are nonjusticiable *(United States ex rel. Joseph v Cannon,* 642 F2d 1373, *cert denied* 455 US 999), as well as prior judicial refusal in this State, dehors the Speech or Debate Clause, to intrude in the internal operations of a coordinate branch of government. *(See, e.g., Matter of Gottlieb v Duryea,* 38 AD2d 634, *affd* 30 NY2d 807, *cert denied* 409 US 1008.)

It has been recognized that the separation of powers in our tripartite form of government gives rise to so-called "political questions", not to be confused with "political cases", which are not appropriate for judicial intervention and which are held to be nonjusticiable. While the contours of what constitutes such a "political question" are necessarily flexible, and not always easy of definition, the United States Supreme Court in *Baker v Carr* (369 US 186) set forth relevant criteria to enable a court to make a determination as to whether a "political question" can be said to exist in a particular situation. That court observed that it is the relationship between the judiciary and the coordinate branches of government which give rise to a "political question" in a particular case and the "nonjusticiability of a political question is primarily a function of the separation of powers" (at 210). To enable a court to determine whether a nonjusticiable "political question" is involved, the following criteria are set forth in that case (at 217):

"[1] A textually demonstrable constitutional commitment of the issue to a coordinate political department; or

"[2] a lack of judicially discoverable and manageable standards for resolving it; or

"[3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

"[4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

"[5] an unusual need for unquestioning adherence to a political decision already made; or

"[6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question".

If any one of the foregoing is "inextricable from the case at bar", the matter can be held to involve a nonjusticiable political question. *(Baker v Carr, supra,* at 217.)

In arguing that the scope of the duties performed by legislative employees, including those that are of an exclusively political nature, constitute a nonjusticiable issue, defendants

rely on three prongs of the *Baker v Carr* formulation. They are the " 'textually demonstrable commitment' of appropriation, budgetary and legislative assignment issues to the Legislature, the 'lack of judicially discoverable and manageable standards for resolving' the case, and the 'impossibility of deciding [the case] without an initial policy determination of a kind clearly for nonjudicial discretion' ".

We agree that relevant considerations raised in *Baker v Carr (supra)* are implicated and inextricably entwined with the facts of the instant case to the extent it relates to the issue of whether the assignment of legislative employees to work on senatorial campaigns falls within the proper duties of such employment.

Our analysis is undertaken within the parameters of the continually reaffirmed precept that "[t]he object of a written Constitution is to regulate, define and limit the powers of government by assigning to the executive, legislative and judicial branches distinct and independent powers. * * * It is a fundamental principle of the organic law that each department should be free from interference, in the discharge of its peculiar duties, by either of the others". *(People ex rel. Burby v Howland,* 155 NY 270, 282; *Saxton v Carey,* 44 NY2d 545, 549; *Matter of County of Oneida v Berle,* 49 NY2d 515.)

Under our State Constitution, the Legislature is vested with sole authority to enact laws for the appropriation of funds to be paid out of the State treasury (art VII, § 7; *People v Tremaine,* 252 NY 27), and to "regulate and fix the wages or salaries and the hours of work or labor * * * of persons employed by the state" (art XIII, § 14). Article VII, § 7 expressly provides that "every such law making a new appropriation * * * shall distinctly specify the sum appropriated, and the object or purpose to which it is to be applied". The legislative budget covering the period here in question included an appropriation for the specific purpose of providing funds for "personal service of employees and for temporary and expert services of legislative and program operations" and "personal service of employees and for temporary and expert services of standing committees". The appropriation does not further describe the activities within its scope. However, legislative committees have the power to "employ needed assistants and fix their compensation within the amount available to the committee by appropriation." (Legislative Law § 9.) Similarly, the Senate Minority Leader is allowed to "appoint such employees to assist him in the performance of

his duties as may be authorized and provided for in the legislative appropriation bill." (Legislative Law § 6 [2].)

"[A]s a matter of substantive law every legislative enactment is deemed to be constitutional until its challengers have satisfied the court to the contrary". *(Montgomery v Daniels,* 38 NY2d 41, 54.) Here, of course, there has never been any direct attack on the constitutionality of the particular budget appropriation involved, or any part thereof, on the basis that it violates some constitutional provision or otherwise. *(Cf., New York Pub. Interest Research Group v Steingut,* 40 NY2d 250, *supra; Fox v Mohawk & Hudson Riv. Humane Socy.,* 165 NY 517; *Matter of Borup,* 182 NY 222.)

Generally, the courts will not interfere with the internal procedural aspects of the legislative process, but judicial review may be undertaken with respect to the budget to determine whether the Legislature has complied with *constitutional prescriptions as to legislative procedures (Matter of Board of Educ. v City of New York,* 41 NY2d 535, 538; emphasis added) and the courts may intervene in the budgetary process to ensure that *the methodology* prescribed by the Constitution is properly utilized, as in the case of itemization, but it will not intrude *in the degree of itemization* which is best left to the Legislature, for it is not something which can be accurately delineated by a court. *(Saxton v Carey, supra,* at 550; emphasis added.)

The dissent asserts that "[t]he Court of Appeals has repeatedly held that the judiciary not only may, but must, decide whether purportedly 'internal' legislative procedures comply with State statutes and constitutional provisions" citing *Matter of Board of Educ. v City of New York (supra)* and *Matter of Anderson v Krupsak* (40 NY2d 397). Reference to those cases is, indeed, instructive. In *Matter of Board of Educ. v City of New York,* the issue was whether the Legislature procedurally had properly overridden the Governor's veto of the Stavisky-Goodman Law (L 1976, ch 132) in conformity with both the provisions of the Constitution and the rules of the Senate. In *Matter of Anderson v Krupsak,* the issue was again concerned with whether specific procedural mandates (of section 202 of the Education Law) were complied with in connection with the election by the Legislature of members of the Board of Regents. Thus, these cases speak to the legality of the procedures by which particular legislation is enacted in distinction to the internal operational and organizational practices of the Legislature itself which are involved in the instant case.

Here, there is no direct challenge to the constitutionality or validity of either the budget or any other particular legislative enactment. The People apparently assert that because the legislative budget enactment did not expressly authorize the payment of salaries to employees who engaged in political or campaign activities, such were ipso facto illegal. It may be noted that the budget allocation in question did not expressly authorize payments to those who operated typewriters, computers or did research on various matters. As already detailed, the bill was drafted in the broadest of terms merely speaking of "funds for personal service of employees". The dissent's reliance on *Farrington v State of New York* (248 NY 112) for the proposition that "whether a legislative expenditure is an unconstitutional gift of public funds masquerading as a legitimate appropriation always gives rise to 'a question of legislative power which must be determined by the courts' " is somewhat puzzling in the context of this case. In *Farrington,* the court dealt with a private legislative enactment conferring jurisdiction on the Court of Claims to determine a claimant's claim for the recovery of counsel fees expended by reason of his wrongful discharge. While the court found that enactment to be constitutional within the "gift of public money for private purposes" clause, there again the issue was whether a specific statute was valid or violative of a constitutional provision. The issue here is a wholly different one dealing with certain expenditures for salaries pursuant to a broadly drafted budget appropriation that has never been directly challenged.

The Constitution textually commits the issue of budget enactment and regulation of wages and hours of State employees to the Legislature, which in this case has exercised that authority by merely broadly directing that a particular allocation be used "for personal services of employees". The People's assertion that the extent to which that allocation has been properly used is "a question of law to be determined by the Court" implicates other considerations raised in *Baker v Carr* (369 US 186, *supra)* which impact on the question of the justiciability of such issue. Implicit in that undertaking would be the need for the court to exercise its judgment to delineate with some specificity the scope of the particular activities constituting the "proper duties" of a legislative employee during the period covered by the indictment. Crucial to any such determination would be whether there are discoverable and manageable standards that would permit judicial review of that issue, as well as the further consideration of whether

intrusion into this area would require a policy resolution that is inappropriate for judicial action. Central to this issue, of course, is the extent to which political activities and working on political campaigns can be said to fall within the ambit of such "proper duties", particularly in the context of the Minority Leader's role and function.

█ While the Legislature is constitutionally vested with the authority to "regulate and fix the wages or salaries and the hours of work or labor * * * of persons employed by the state", the Minority Leader of the Senate is given the power by statute, to "appoint such employees to assist him in the performance of his duties as may be authorized and provided for in the legislative appropriation bill" (Legislative Law § 6 [2]) and certain other employees to fill specified offices and positions (Legislative Law § 7). As the appointing officer of these various employees, he is given the authority to determine their tenure (Legislative Law § 8) and their compensation (Legislative Law § 10). The duties of the Minority Leader of the Senate are not otherwise defined nor is there any further statutory illumination of the scope or nature of the duties of legislative employees. Clearly, however, these are matters which are singularly within the Legislature's own purview involving as they do the internal procedures and administration of the functions and peculiar duties of that body, which it has been held should be free from interference from another branch of government. *(Matter of Gottlieb v Duryea,* 38 AD2d 634, *affd* 30 NY2d 807, *cert denied* 409 US 1008, *supra; also see, Public Citizen v Simon,* 539 F2d 211; *Davids v Akers,* 549 F2d 120.)

While it is unquestioned that during the time period covered by the indictment there were no legislatively promulgated standards or rules governing the nature or scope of the duties or other terms of employment for Senate employees, there is a long history indicating the Legislature's awareness of and sensitivity to the interrelationship between political considerations and legislative activity and its failure to take action regarding the issue. In 1945, a New York State Joint Legislative Committee declared that the duties of the Senate Minority Leader included "conduct[ing] legislative program for minority party", and that the duties of the Minority Leader's administrative staff included "[p]erform[ing] administrative, research, clerical, [and] publicity services for party program" (Interim Report of NY St Joint Legis Comm on Legis Methods, Practices, Procedures and Expenditures, 1945

NY Legis Doc No. 35, chart 7, at 52). The Joint Committee also recommended against civil service status to legislative employees because, *inter alia,* "legislative personnel must continue to be recruited from groups sympathetic to a legislator's program", "[u]nder our theory of government where party programs have been the basis for legislation, it might hamstring a legislator to surround him with employees unsympathetic to his point of view or to whom party strategy cannot be confided", and, significantly, "civil service employees would not be free to participate in the political activity generally required of a legislator" *(id.,* at 31, 32).

After the 1982 election, then Assembly Speaker Stanley Fink proposed that the Legislature adopt rules governing the use of legislative employees in legislative campaigns but no action was taken on that proposal and no guidelines adopted although the Minority Leader and his chief of staff did explore the issue in 1982 and 1983 with the Senate counsel Eric Lane and a legal consultant to the Senate, Professor Agata. It was also a topic of discussion at a 1984 Minority Conference steering committee meeting.

In September 1985, the District Attorney of Kings County, Elizabeth Holtzman, after an investigation of then Assemblyman Charles Schumer's use of legislative staff in his campaign for Congress concluded that there were no guidelines or laws covering the use of State legislative aides for campaigning purposes and therefore no New York State law had been violated. She then referred the matter back to the Legislature with the following statement and recommendation: "there was no basis for criminal prosecution under New York State laws. Our investigation indicated that a need exists for the Legislature to establish controls to prevent the substantial use of state employees and facilities by its members for campaign purposes. In particular, there is a need for specific job descriptions, improved time accountability, and specific rules governing the use of any of state employees and facilities for campaign purposes. Sanctions should also be provided for those individuals who intentionally violate these rules."

In March 1987, the Joint State-City Commission on Integrity in Government was established focusing on the entire issue of ethics and propriety in all areas of governmental operations.

It was not, however, until April 1987, after the investigation leading to this prosecution was publicized, that the Legisla-

ture, in Concurrent Resolution No. 812, finally took steps "to provide guidelines for members and legislative employees with respect to participation of legislative employees in political activity" acknowledging that no guidelines exist "to assist members and legislative employees regarding the participation of such employees in political campaign activity" and that "legislative employees are not prohibited by statute, rule, regulation or otherwise from engaging in political campaign activity". That resolution established a blue ribbon commission to review the use of legislative employees participating in campaign activities and promulgated the following interim guidelines pending the commission's report:

"1. That it is the rule of the New York State Legislature that legislative employees of a member, officer, legislative commission or committee of the Legislature are compensated from funds of the New York State treasury for the performance of officials duties on behalf of the member, officer, legislative commission or committee. The official duties of a legislative employee, the adequacy of performance thereof and the compensation therefore are the exclusive prerogatives of the Legislature.

"2. It is hereby established as the rule of the Legislature that no person shall be hired by the Legislature to engage solely in political campaign activity. However, when a legislative employee is not obligated to perform duties assigned to him, or her, the employee is free to engage in political campaign activities.

"3. As to the standards applicable to the duties of legislative employees, although no precise job descriptions are in force for such employees, it is expected that such employees will approach their duties with general ethical standards in mind and use good judgment and common sense.

"4. A legislative employee's official duties may include, by way of example only, representational activities, such as constituent casework, preparation of news releases and newsletters to constituents, public appearances and other responsibilities which are not political campaign activity.

"5. Legislative employees may properly be engaged in political campaign activity, provided such activity does not cause the employee to neglect his, or her, official duties."

In August 1987, Governor Cuomo approved both the Ethics in Government Act (L 1987, ch 813) which created the Legislative Ethics Committee, and the companion New York State

Governmental Accountability, Audit and Internal Control Act of 1987 (L 1987, ch 814) requiring the Senate to establish internal procedures governing areas such as payroll and personnel.

There is no question, therefore, that prior to April 1987, and particularly during the period covered by the indictment, there were no legislative standards, rules or guidelines in existence detailing the "proper duties" of legislative employees, an issue which was officially addressed for the first time in the 1987 resolution. Essentially, the Legislature declined to act during that period in an area that was its exclusive prerogative—the administration of its own internal affairs— albeit that it has now finally undertaken its responsibilities in that regard.

Notwithstanding the absence of any legislatively enacted guidelines during the relevant period, the trial court held that there was a standard which controlled here, pointing to article VII, § 8 of the NY Constitution referred to as the "No Gift" Clause, which provides that: "The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private undertaking; nor shall the credit of the state be given or loaned to or in aid of any individual, or public or private corporation or association, or private undertaking".

It concluded categorically that payment to legislative staff for work on political campaigns was "an unconstitutional private application of public revenue" which provided a sufficient predicate for criminal prosecution. Significantly, no authority is offered to support the ultimate conclusion that a violation of the provision, assuming, arguendo, that such exists, is subject to penal sanctions. The provision itself specifies no penalty for its violation, nor is any statute pointed to which so provides. Moreover, none of the authorities relied upon by the court arose in the context of a criminal prosecution. For example, *Stern v Kramarsky* (84 Misc 2d 447) and *Matter of Phillips v Maurer* (67 NY2d 672) both involve injunctions against *administrative agencies* enjoining their expenditures of funds for the promotion of, in one case the Equal Rights Amendment, and in the other a budget and bond issue. As administrative agencies, in distinction to the legislative branch, they were limited merely to providing information in a neutral, rather than a partisan, vein. Moreover, *Matter of Phillips v Maurer (supra)* dealt with expenditures

under particular sections of the State Education Law rather than within the context of this constitutional provision.

■ We do not find that this provision, standing alone, would provide the kind of clear and unambiguous guidance necessary to enable appropriate judicial resolution of the issue at hand which involves not an individual case determination but, rather, a wide-scale particularization of the propriety of the specific activities and terms and conditions of employment of numerous employees working in a broad range of categories. This would require precisely the kind of "itemization" which has been held not to be a court's function. *(Saxton v Carey,* 44 NY2d 545, *supra.)* The failure of the Legislature to act in promulgating appropriate standards governing the duties and assignments of its employees, a matter within its sphere of authority, does not entitle another branch of government, "to fill the vacuum and impose a solution of its own", as the People have here attempted. *(Boreali v Axelrod,* 71 NY2d 1, 13.)

Moreover, for a court to attempt to determine the proper scope of the duties of legislative employees in the absence of manageable guidelines or standards would require the kind of policy determination which in our view is not suited for judicial discretion.

■ Any such determination would involve an underlying policy consideration as to the extent to which activities of a political nature may appropriately be engaged in by legislative employees. This necessarily requires an exploration of the unique role which politics plays in the legislative arena in distinction to the other two branches of government. Once elected, executive branch officials assume the titles of their offices without any partisan party characterization. Judicial officers, whether elected or appointed, upon taking office must become wholly apolitical. It is only in the legislative branch that the partisan political party affiliations of elected representatives continue to cloak their official activities. The terms Majority Leader and Minority Leader are incorporated in the Legislative Law which delineates the Senate's hierarchy. As a consequence, the ability to effectively accomplish particular legislative goals is in great measure predicated upon such partisan party affiliations. Enactment of legislation cannot be separated from political involvement and, realistically, political party platforms are the basis for legislation under our system of government. The wide range of activities performed outside the purely legislative sphere which have grown over

the years in part because they are a means of developing continuing support for future elections have been held to be entirely legitimate activities. *(United States v Brewster,* 408 US 501, *supra.)* It can be argued that politics historically has been an integral part of the legislative process and is intimately related to, and intertwined with, the legislator's public role in attempting to garner public support for the legislative programs which he or she espouses; and, the record indicates that the use of legislative staff for a broad spectrum of political duties, including partisan campaigns, is not a new phenomenon. That this practice may be personally distasteful or offensive to us is, however, not the barometer. The question is whether it is appropriate for a court to attempt to legislate the precise terms and conditions of employment which, in its judgment, constitute "the proper duties" for employees of another coequal branch of government, whose character and operations are in so many ways at variance with the judicial format both in its partisan character and activities as well as in the irregularity and seasonal vagaries of its work schedule.

We find persuasive the decision in *United States ex rel. Joseph v Cannon* (642 F2d 1373 [DC Cir], *cert denied* 455 US 999) where the court was presented with precisely the same issue. There, in a suit under the Federal False Claims Act, it was alleged that Senator Cannon had defrauded the United States by authorizing regular salary payments to an aide who for 20 months had worked "extensively and exclusively" on the Senator's reelection campaign (at 1375). The moneys in question had been appropriated to the United States Senate solely to compensate senatorial employees for performance of official duties. The court declined to answer or analyze the "insurmountable dilemma" of whether campaign work is an official activity, stating that it could not review the case " 'without an initial policy determination of a kind clearly for nonjudicial discretion' " (642 F2d, at 1379, quoting *Baker v Carr,* 369 US 186, 217). The court initially looked to the Senate rules and practices for assistance in determining the issue. Noting that the United States Senate had been unable to formulate guidelines, the court held that: "[T]he inability of the Senate—a body constitutionally authorized and institutionally equipped to formulate national policies and internal rules of conduct—to solve the problem demonstrates 'the impossibility of deciding' the issue appellant poses 'without an initial policy determination of a kind clearly for nonjudicial discretion.' Indeed, the interpretation of the False Claims Act

suggested by appellant would license the courts to monitor every action taken by a Senator and his aide in an effort to determine whether it is sufficiently 'official' or too 'political.' " *(Supra,* 642 F2d, at 1384.)

The court further observed that in the absence of any discernible legal standard, or even of a congressional policy, that would aid consideration and decision of the question, it was loathe to give the act an interpretation "that would require the judiciary to develop rules of behavior for the Legislative Branch. We are unwilling to conclude that Congress gave the courts a free hand to deal with so sensitive and controversial a problem, or invited them to assume the role of political overseer of the other branches of Government." *(Supra,* 642 F2d, at 1385.)

The attempt by the People and the dissent to distinguish the *Cannon* case *(supra)* on the ground that the United States Senate had unsuccessfully tried to promulgate guidelines is somewhat puzzling in light of the State Legislature's similar failure to do so prior to 1987.

The trial court itself very articulately and perceptively delineated the special characteristics of legislative-political interaction which render inappropriate judicial intrusion, as follows: "Certainly, there is nothing illegitimate about the role of the Senate Minority Leader as coordinator of the minority party's political and legislative strategy within the Senate. Nothing could be clearer * * * than that the function of the Senate Minority Leader's office, the delegation of duties by the Minority Leader, and the execution of those duties by the Leader's staff are beyond the power of courts to examine, much less to dictate. * * * Neither may the executive nor this court arrogate to itself the authority to prohibit the Minority Leader from assigning staff to coordinate with Democratic Party leaders in developing a legislative strategy, to poll constituents to determine their views of the Senate minority's program, or to engage in the myriad political activities through which constituents may influence and legislators may explain or garner support for legislation. * * * It is a basic tenet of our system of government that legislation and legislators should reflect the popular will, which is primarily manifested through the competitive political process. Therefore, the line between partisan political action and constituent representation is and should be elastic, and is not subject to judicial or executive fiat. Whether and to what extent the process of forging a popular consensus in support of a legislative agency

may be distinguished from the promotion of a party's or an individual's political aspirations is a difficult issue, requiring factual determinations and policy decisions that are beyond the competence of courts to decide within the limits of a particular controversy." *(Supra,* 139 Misc 2d, at 943-944.)

We are in agreement with Justice Rothwax's conclusion that insofar as this indictment relates to legislative employees who performed services during the period in question, whether of a legislative or of a political nature, it constitutes an inappropriate attempt by the People to regulate the internal affairs of the Legislature and deals with nonjusticiable questions *(Matter of Gottlieb v Duryea, supra; cf., Public Citizen v Simon,* 539 F2d 211, *supra),* and we affirm his dismissal of the counts predicated upon the activities of those employees.

Our point of departure from his decision is his conclusion that employees assigned to work only on campaigns were engaged exclusively in private activity that was per se illegal and therefore constituted an appropriate basis for a criminal prosecution. This, in effect, constitutes a form of judicial legislation which simultaneously makes the same conduct both legal and illegal—justiciable and nonjusticiable, based on a vague quantitative guideline rather than the nature of the activity itself. We reject that interpretation and find that the very considerations which render nonjusticiable the activities of the employees in Category 1 and Category 2 are equally applicable to those in Category 3. As he observed, "[w]hether and to what extent the process of forging a popular consensus in support of a legislative agenda may be distinguished from the promotion of a party's or an individual's political aspirations is a difficult issue, requiring factual determinations and policy decisions that are beyond the competence of courts to decide within the limits of a particular controversy." *(Supra,* 139 Misc 2d, at 943-944.) The inextricable relationship between the legislative and the political is no less with respect to those employees. It cannot categorically be said that they did not perform services to some extent reasonably related to their legislative employment, in distinction to legislative employees who have been used solely for the personal business or pecuniary interests of their legislative employers, as in *United States v Diggs* (613 F2d 988, *cert denied* 446 US 982), where the court expressly noted that it was not dealing with a Congressman's discretion to define the duties of an employee.

The assignment of some employees to campaign work only,

was as much a legislative personnel judgment, in an area wholly within the Legislature's purview, as was the part-time assignment of others to similar activities. That it was a questionable judgment that may evoke disapproval and justifiable criticism does not, in our view, render it subject to judicial or prosecutorial oversight. For the abysmal failure of the Legislature, and particular legislators, to fulfill their responsibilities in not adopting appropriate guidelines governing the assignments and duties of their employees, "the remedy lies not in the courtroom, but in the voting booth". *(Saxton v Carey, supra,* at 551.)

Particularly apt in this regard is former Chief Judge Breitel's conclusion in *Rapp v Carey* (44 NY2d 157) which declared unconstitutional a Governor's Executive Order requiring a wide range of State employees within the Executive branch to *inter alia* abstain from various political and business activities. He pointedly observed: "The restriction on political activities is particularly troublesome. While the restriction on the merits would be supported by many or even most, it involves a broad question of policy, hardly resolvable by other than the representatively elected lawmaking branch of government, the Legislature." *(Supra,* 44 NY2d, at 165.)

Separate and apart from separation of powers considerations, we also find that the instant prosecution violates the defendants' due process rights with respect to the manner in which the various Penal Law provisions have been applied to them insofar as the charges relate to employees in any of the three categories that performed services.

It is a fundamental principle of due process "that no [person] shall be held criminally responsible for conduct which he [or she] could not reasonably understand to be proscribed." *(United States v Harriss,* 347 US 612, 617; *see also, Lanzetta v New Jersey,* 306 US 451, 453.)

This principle was recently reaffirmed by our Court of Appeals which observed that: "Consistent with our concept of basic fairness, due process requires that a penal statute be sufficiently definite by its terms so as 'to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute' ". *(People v Bright,* 71 NY2d 376, 382-383, quoting *United States v Harriss,* 347 US 612, 617, *supra.)*

In this case in order for defendants to be charged under the various larceny and false filing counts of the indictment which

are based on the activities of employees who performed services, either legislative and campaign or campaign alone, there must be some penal proscription which rendered wrongful the assignment of legislative employees to political or campaign duties during the period covered by the indictment.

The People can point to no statute, or other rule or regulation, that proscribed such conduct during the time periods set forth in the indictment, or that provided that it was illegal. The People now point to the "No-Gift" Clause of the Constitution as a standard of "illegality". Even if it were to be assumed that the activities in question fall within the constitutional proscription, and our prior discussion indicates our view to the contrary, there is no penalty specified in that constitutional provision for its violation nor is there any statute which has been enacted which renders its violation criminal. It has been held that the duty and responsibility of determining the method of compliance with constitutional mandates is peculiarly within the legislative sphere. *(Felder v Fullen,* 27 NYS2d 699, *affd* 263 App Div 986, *affd* 289 NY 658.) Here, of course, no penal statute has been enacted to obtain compliance with this section of the Constitution and the absence of penal legislative action in this regard would preclude use of that provision as the basis for criminal action. *(See, People ex rel. Blumke v Foster,* 300 NY 431; *cf., People v Freres,* 5 AD2d 868; former Penal Law § 22, incorporated in current Penal Law § 5.05 [1], [3]; *see,* Derivation and Disposition Tables, L 1965, ch 1030, at 2483, 2492.)

It is not insignificant that every case cited with respect to a violation of this provision is in a civil, not a criminal context and in most instances the issue involved is the validity of a particular statute. *(See, e.g., Stern v Kramarsky,* 84 Misc 2d 447, *supra; Corning v Village of Laurel Hollow,* 48 NY2d 348; *Matter of Boyd v Collins,* 11 NY2d 228; *Matter of Borup,* 182 NY 222; *People v Westchester County Natl. Bank,* 231 NY 465; *Fox v Mohawk & Hudson Riv. Humane Socy.,* 165 NY 517, *supra; see also, Fair Political Practices Commn. v Suitt,* 90 Cal App 3d 125, 153 Cal Rptr 311.) The courts have been careful not to "elevate civil wrongs to the level of criminal larceny". *(People v Foster,* 73 NY2d 596, 604; *cf., People v Keeffe,* 50 NY2d 149.) Moreover, in deciding whether there is a due process violation the courts are more tolerant of ambiguities in civil cases than in criminal matters because the "consequences of imprecision are qualitatively less severe". *(Hoffman Estates v Flipside Hoffman Estates,* 455 US 489, 499.) Indeed,

in *New York Pub. Interest Research Group v Steingut* (40 NY2d 250, *supra)* where the court found that particular allowances under a supplemental budget bill exceeded constitutionally specified limits, it rejected a demand for restitution of such unauthorized funds.

Notwithstanding the People's emphasis on NY Constitution, article VII, § 8, and the trial court's embrace of that provision, it is essentially irrelevant because it was never submitted to the Grand Jury as a basis for finding that the conduct complained of was illegal or improper.

■ In his presentation to the Grand Jury, the prosecutor continually referred to false certification by defendants that the employees had performed "legislative" duties. But that is not what the certification form itself stated. That form provides that the employee "actually performed the *proper duties* of the position" (emphasis supplied). The distinction between "legislative duties" and the various other duties and activities engaged in by legislative employees which are proper *(United States v Brewster, supra)* is extremely significant, particularly where, as here, there were no guidelines or standards, during the period in question, which defined the parameters of the "proper duties" of legislative employees.

The fatal deficiency in the instant prosecution was the failure, or inability, of the People to provide the grand jurors with some specific statutory provision, or other appropriate guideline, from which they could find that the specified conduct was proscribed or fell outside of the "proper duties" of a legislative employee. To advise the Grand Jury to consider whether the conduct was "right" or "proper" as a basis for a criminal prosecution is hardly consistent with due process requirements that a person of ordinary intelligence be given notice that his contemplated conduct is forbidden by the statute *(United States v Harriss, supra)* and that explicit standards be provided for those who apply a statute in order to avoid arbitrary enforcement *(Smith v Goguen,* 415 US 566).

Reference to the Grand Jury proceedings clearly demonstrates that the basis on which the People proceeded herein was directly violative of these due process considerations. Its theory was to allow the Grand Jury itself to set the standard as to whether campaign activities by legislative employees should be criminalized. Thus, the prosecutor advised the Grand Jury:

"I did not ask * * * whether it was proper to do campaign

work. And that is going to be a question for you, ladies and gentlemen of the jury, to answer.

"But the second question was whether there were state laws which regulated the work of the legislative employees. And that's something that we're going to get into when we instruct you as to the law in this case." (Grand Jury minutes, at 3172.)

Thereafter, while the Grand Jury was voting on various counts, the following colloquy took place:

"Grand Juror: At some point, will you be giving us some indication as to what the action is regarding campaigns. I know it's very complex and very vague. Not this minute.

"[ADA] Mr. Cherkasky: I know the fact—There is specific questions. I will—What we have presented to you are—there is no one statute that states use or there's no specific statute addressed to the use of political workers in campaigns just that title. What we ask you to consider are the larceny statutes, the documents statutes, the theft of service statutes, the governmental fraud statutes to see whether in fact that conduct is illegal, the use of government workers is illegal under those statutes." (Grand Jury minutes, at 4316.)

An indictment based on such noninformative and amorphous instructions fails to comport with the due process principles, codified in section 1.05 of the Penal Law, which require the giving of "fair warning of the nature of the conduct proscribed" and defining "the act or omission * * * which constitute[s] each offense", and is also at variance with the express direction which states that "Acts otherwise innocent and lawful do not become penal unless there is a clear and positive expression of intent to make them criminal" (McKinney's Cons Laws of NY, Book 1, Statutes § 271 [d]).

"Due process requires that all 'be informed as to what the State commands or forbids' * * * and that 'men of common intelligence' not be forced to guess at the meaning of the criminal law." *(Smith v Goguen, supra,* at 574.) " 'The dividing line between what is lawful and unlawful cannot be left to conjecture. * * * The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, *in advance,* what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another' ". *(Connally v General Constr. Co.,* 269 US 385,

393 [emphasis added], citing *United States v Capital Traction Co.,* 34 DC App 592.)

It can hardly be said that the premise upon which the People have here proceeded meets that standard. When presented with the same issue of whether use of a legislative employee in campaign activities constituted a criminal act, Elizabeth Holtzman, the District Attorney of Kings County, a prosecutor of coordinate jurisdiction, found no criminal violation. The Trial Judge herein refused to criminalize such activities where the employee, in addition, performed some other noncampaign services, no matter how minimal. The Legislature has acknowledged that until April 1987 no standards or guidelines had ever been promulgated to define the "proper duties" of its employees, that no rules or statutes had ever been enacted proscribing campaign or political activities by Senate employees and that some such activities had long been an accepted practice. The District Attorney of New York County, alternatively, takes the position that all political campaign activities engaged in by legislative employees are subject to criminal prosecution.

Where people of common intelligence differ so markedly as to the meaning of the law in relation to the conduct involved, it must be held that this prosecution fails to meet requisite due process standards. *(See, United States v Harriss, supra,* at 628 [Douglas, J., dissenting].)

"[T]he laws and policies of this State are established by the law making powers, not by 'officers acting on their own ideas of sound policy however excellent such ideas may be' " *(Matter of County of Oneida v Berle, supra,* 49 NY2d, at 523, citing *Matter of Picone v Commissioner of Licenses of City of N. Y.,* 241 NY 157, 162).

Accordingly, since we find that the counts in the indictment predicated on the activities of campaign only employees (Category 3) were returned in violation of the defendants' due process rights, those counts are dismissed on this ground as well as on the basis of prudential concerns leading to nonjusticiability. In light of these dismissals, the conspiracy count is rendered meaningless and is, therefore, also dismissed.

█ We turn, finally, to those persons denominated "No-Shows" who performed no services whatsoever. Our prior holdings both as to nonjusticiability and due process have no application to this group. The preceding discussion focused upon the scope of services that could properly be rendered by

legislative employees. Implicit in the Senate certification forms is that the employee has rendered *some* services. If the defendants certified payroll forms knowing that a person was not in fact performing *any* services, their conduct would fall within the proscription of the offering a false instrument for filing statute. (Penal Law § 175.35.)

As was held in *People v Hochberg* (87 Misc 2d 1024, 1030-1031, *later appeal* 62 AD2d 239, *lv denied* 44 NY2d 953) with respect to such a hiring, "One who recommends a person for public employment and causes him to be hired by the State of New York is by inescapable inference representing that he will perform the work for which the salary is paid. The word, earn, is defined to mean 'to receive * * * for one's labor or service' (Webster's New World Dictionary [Coll ed, 1966]). If the defendant caused the State to employ Mr. Johnson * * * then defendant led the State to believe that he would earn the salary; and if he knew that this was not true, he was guilty of attempting to steal money from the State". *(See also, People v Riccio,* 91 AD2d 693.)

The evidence before the Grand Jury showed that four employees—Joseph Walsh, Carmen Del Priore, Arnold Smith and Barbara Zebersky—performed no services whatsoever during specified periods, but received salaries from the Senate payroll during those periods. The defendants had these employees placed on the payroll to be paid for performing services. If defendants knew that these persons were doing no work then they could be guilty of larceny by false pretenses—i.e., that the particular defendant made a false representation of a past or existing fact knowing that the representation was false when made with intent to deprive and defraud the State of moneys. (Penal Law former §§ 155.35, 155.40.) The relevant issues including those of intent and knowledge are questions of fact for a jury to decide.

Accordingly, the defendants-petitioners' article 78 petition is granted to the extent that respondents are prohibited from prosecuting defendants-petitioners under New York County indictment No. 10173/87 as to those counts that relate to Category 3 employees, and is otherwise denied. The prosecution may continue with respect to the 119 counts (listed in Appendix A attached hereto) which relate to the four employees who performed no services whatsoever—Joseph Walsh, Carmen Del Priore, Arnold Smith and Barbara Zebersky.

The order of the trial court, Supreme Court, New York

County (Harold Rothwax, J.), dated June 15, 1988, which dismissed 265 substantive counts, and struck certain language and 89 overt acts from the conspiracy count of the indictment is affirmed.

## APPENDIX A

## COUNTS RELATING TO CATEGORY 4.

WALSH—      33, 50, 53, 56, 59, 62, 65, 68, 73, 79, 85, 90, 96, 104, 113, 427, 429, 431, 433, 435, 437, 439, 441, 443, 445, 447, 449, 451, 453, 455, 457, 459, 461, 463, 465, 468, 471, 474, 477, 480, 483, 512, 513, 514, 515, 516, 517, 518, 519, 520, 522, 524, 526, 528, 530, 532, 534, 536, 538, 540, 542, 544, 546, 548, 550, 552, 554.

DEL PRIORE—  28, 193, 211, 229, 247, 265, 283.

SMITH—      32, 37, 52, 55, 58, 61, 64, 70, 75, 81, 87, 92, 98, 106, 115, 127, 142, 467, 470, 473, 476, 479, 482, 485.

ZEBERSKY—    556, 557, 558, 559, 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576.

SULLIVAN, J. (dissenting). The People's appeal from an order dismissing or modifying certain counts of the indictment, and defendants' original proceeding (CPLR art 78), brought to prohibit the prosecution of the remaining counts, were heard together and present common issues. Defendants claim, *inter alia,* that the indictment, which is an outgrowth of an extensive investigation into charges of the misuse of public funds for the financing of the political campaigns of certain Democratic State senatorial candidates during the 1986 general election, involves matters as to which they are immune from prosecution under the Speech or Debate Clause of the NY Constitution, and that it represents an unlawful intrusion into the Legislature's affairs violative of the separation of powers doctrine.

The Grand Jury heard evidence that during the months prior to the November 1986 general election, defendant Ohrenstein, the Minority Leader, sought to secure a Democratic majority in the Senate, and thereby become Majority Leader.[1]

---

1. The attempt to wrest control of the State Senate from the Republicans failed. The composition of the Senate remained 35 Republicans and 26 Democrats.

In pursuing that goal, Ohrenstein, together with his chief of staff, Francis Sanzillo, State Senator Howard Babbush, and former State Senator Joseph Montalto, in a scheme that cost New York taxpayers hundreds of thousands of dollars, conspired to hire individuals to work exclusively on selected Democratic campaigns throughout the State and to pay them from the State treasury by placing them on the Senate payroll and falsely representing that they were performing legislative duties. In addition, Ohrenstein and his associates agreed to assign members of the Senate staff and the minority staffs of legislative commissions to work full time on these campaigns while remaining on the Senate payroll. Some campaign workers who did either general fund-raising work or, in some cases, absolutely nothing were also paid from public funds.

In furtherance of the conspiracy, defendants placed approximately 18 persons on the Senate staff, assigned them to individual campaigns, certified that they were entitled to biweekly State paychecks, and then removed them from the payroll after the election (the "campaign only employees"). During the course of the 1986 campaign, they also hired and placed on the State payroll eight individuals who worked solely on the campaigns but were then retained for the 1987 legislative session (the "retained campaign employees"). In addition, approximately 10 persons who were on the Senate staff before the commencement of the 1986 campaign were "farmed-out" to assist individual candidates on a full-time basis while remaining on the State payroll (the "farmed-out employees").[2] Finally, the evidence revealed that at least three employees had, in fact, not done any work at all in exchange for their wages (the "no-show employees").

The evidence shows that Ohrenstein exercises direct and indirect control over the allocation and disbursement of funds for the staffing of minority Senators' offices and for minority representation on senatorial commissions. Funds appropriated in the State budget for the Senate are allocated along party lines through negotiation between Ohrenstein and the Majority Leader. After the two leaders have decided on the amount of money that will be made available to staff the offices of the minority Senators, Ohrenstein allocates funds to each Senator to meet staff salaries and other office and administrative expenses.

---

2. These include two employees who were assigned to engage exclusively in fund-raising activities rather than to assist in individual campaigns.

Each Senator, within the allotment of funds thus made available, makes his or her staff appointments. Each Senator has discretion to formulate the titles, hours of employment, leaves of absence and vacation time of his or her staff members. The Senator making the appointment executes a "Recommendation for Employment" form, which sets forth the name of the employee and his salary and title. The staff of each Senator can also be augmented through his or her commission assignments, which are made by Ohrenstein, who also fills each minority staff position on the particular commission and formulates each staff member's title.

All staff members, whether assigned to an individual Senator or a legislative commission, are hired either on an annual basis or for the duration of a legislative session; sessional staff members often change payrolls from one session to another. Since 1984, Sanzillo has been Ohrenstein's chief of staff and secretary to the Senate minority. As such, he has, subject to Ohrenstein's review, approved the hiring of all staff members through the Minority Leader's office.

By virtue of his position as Minority Leader, Ohrenstein has a professional staff, which numbered 118 in 1986. The staff provides constituent services to Ohrenstein's district and also serves the Minority Conference, which is designed to forge a unified and cohesive legislative agenda among Democrats. The staff is accordingly comprised of several groups: the district office staff, a press and public relations staff, an administrative and clerical staff, a program staff which researches and drafts the legislative proposals of the Minority Conference, and the minority counsel staff, which supervises the activities of the program staff and the commission staff, composed of staff personal hired by Ohrenstein to work as minority representatives on legislative commissions. Since the commissions are often inactive, commission staff personnel are frequently underutilized or are assigned work unrelated to commission duties, including duties related to the work of the Minority Conference.

Ohrenstein's staff also includes local government coordinators, both downstate and upstate, who are annual employees and conduct the political operation of the Senate minority. The upstate group primarily assesses the political impact of proposed legislation, while the downstate group, along with a few of the upstate coordinators, helps the minority conference formulate its legislative program and assists strategists in Democratic senatorial campaigns.

Staff members assigned to individual Senators and to legislative commissions are paid through the transmission of biweekly payroll certification forms from the Senate to the State Comptroller. Each certification sets forth the roster of employees on the payroll of the individual Senator or commission, listing the employee's name, title, biweekly salary and status as a member of the annual or session staff, and represents that the employees listed "are employed by the New York State Senate in the position specified and have performed the proper duties for the period specified." Each Senator must sign at least one payroll certification pertaining to his or her staff during each quarter in an appropriate year, but can designate a staff member to sign the remaining certifications on his or her behalf. Ohrenstein, for example, has designated Sanzillo to sign the certifications on his behalf.

After a Senator, or designee, certifies that staff members are entitled to their respective salaries for a particular pay period, the certification is sent to the Senate payroll office. A master payroll derived from the certifications submitted by the offices of all Senators is then prepared and transmitted to the State Comptroller's office. The payroll certifications for minority commission staff members are signed by Ohrenstein or Sanzillo and submitted to the chairperson of the appropriate commission who, in turn, prepares a master commission payroll certification and submits it to the State Comptroller's office. After receiving the certifications, the State Comptroller's office prepares the paychecks and forwards them to the Senate payroll office for distribution.

Since at least 1975 all local government coordinators on Ohrenstein's staff have worked on Senate campaigns in every election year and have been routinely assigned to campaigns by his chief of staff. Ohrenstein knew that his staff had worked on campaigns; he approved of the practice, in which both parties in both Houses engaged, and considered such work as part of the Senate staff's duties. It was, however, regarded as unacceptable to hire staff members to work exclusively on individual senatorial campaigns.

In 1980, Arlene Wolff, a friend of Ohrenstein, proposed that an auction of Senate memorabilia be held to raise funds for the Senate Democratic Campaign Committee (SDCC). Ohrenstein approved the proposal and placed Wolff on his payroll at an annual salary of $12,000. Through Wolff's efforts, several fund raisers were conducted for the SDCC in 1981 and 1982.

In 1982, Wolff's salary was $40,000. Evidently in return for this compensation, Wolff met annually with Ohrenstein's chief of staff and, on occasion, with Ohrenstein, and arranged fund raisers for the SDCC, usually held each spring. Wolff continued to arrange the annual fund raiser and to receive her annual compensation through 1987.

Like Wolff, several other employees placed on the Senate payroll before 1986 were paid, even though they did not perform any services for the Legislature. Unlike Wolff, however, some of these individuals did not render any services at all. These are the "no-show" employees. For example, Barbara Zebersky, who was hired by Senator Babbush in 1978 to run both his Albany and district offices, was told, after ending an intimate relationship with the Senator, not to report to the Albany office following the end of the July 1983 legislative session. Although Zebersky continued to report to the district office once or twice a week, she discontinued even those sporadic visits in September 1983. Nevertheless, Babbush continued to sign payroll certifications which permitted her to be paid until April 1984, when she was transferred to Ohrenstein's staff.

After transferring to Ohrenstein's staff, Zebersky, no longer a "no-show" employee, became, like Wolff, an employee who performed only political campaign functions. Specifically, Zebersky was assigned, usually by Sanzillo directly or through an intermediary on the local government coordinating staff, to conduct fund raising on behalf of individual senatorial candidates. When not so engaged, Zebersky did not perform any other work or have any legislative responsibilities.

At least two other employees hired by Ohrenstein and Sanzillo before 1986 were strictly "no-show" employees. In 1983, Joseph Walsh, who had asked the leader of a Democratic club to help him obtain a State job to secure his pension, was placed on the Senate payroll as an administrative analyst and paid $2,000 in 1983 and $3,500 in 1984 and again in 1985. Walsh rendered no services in return for this compensation. When a member of Ohrenstein's staff complained to Sanzillo about this situation in 1986, Walsh was assigned to work with a staff member on issues pertaining to a community board. The staff member, however, never heard from Walsh and, in June 1986, his employment was terminated, ostensibly for budgetary reasons.

Similarly, Arnold Smith was placed on the Senate payroll in

1985. Despite his failure to render any services, he was paid $4,000 in 1985 and $6,000 in 1986. Smith's employment was terminated in July 1986, but he was restored to the minority payroll in January 1987 and assigned to monitor senior citizen affairs. At about that same time the director of Ohrenstein's district office told Smith that he was expected to work. It should be noted that it was in January of 1987 that representatives of the New York County District Attorney's office first began to interview witnesses from Senator Ohrenstein's office. Smith evidently now attends senior citizen meetings and reports to Ohrenstein's office.

In June 1984, Sanzillo recruited William Green to manage the reelection campaign of Senator Carol Berman and placed him on Ohrenstein's staff at an annual salary of $52,000. While receiving that salary, Green did nothing except manage the campaign, which ultimately was unsuccessful. Following the election, Sanzillo transferred Green to the Commission to Revise the Social Services Law at a salary of about $20,000 per annum. Until 1986, when he was assigned to manage Montalto's Senate campaign, Green's only function was to keep Sanzillo informed on the current political situation in Nassau County.

Although Wolff, Green, Zebersky, Walsh and Smith did not perform any legislative services, Ohrenstein and Sanzillo and, for some of the time that Zebersky was on his payroll, Babbush, signed biweekly payroll certifications which affirmed that these individuals performed "the proper duties" of the Senate staff or commission positions that they ostensibly held.

In 1986, a gubernatorial election year, Ohrenstein and the other Senators on the minority conference political steering committee decided to use every means at their disposal to "ride on the coattails" of Governor Cuomo and elect a Democratic Senate. These efforts began as early as March 1986 when, following the death of an incumbent Senator who had represented part of The Bronx and Westchester, the Governor ordered a special election to be held on April 22, 1986. Michael Durso was selected as the Democratic candidate. By the end of March, virtually all of Ohrenstein's local government coordinators were assigned to assist in that campaign.

For instance, Larry Schwartz, the director of the upstate local government coordinators, was assigned to manage the campaign. Mark Canu, Schwartz's downstate counterpart, was also assigned to the campaign, as were various members of

Ohrenstein's program and public relations staffs, a minority commission staff member, and staff members from the offices of at least four other Senators, all of whom were assigned to work full time.

In addition, two individuals who had not previously been on the State payroll were hired to work in that campaign. Jeffrey Feldman was hired in March as a local government coordinator, and was immediately assigned to the Durso campaign. After the campaign ended, Feldman was assigned to a number of other campaigns in the general election; he did not perform any legislative work for the entire time he was on the Senate payroll in 1986. Robert Weingarten was also hired to work on the Durso campaign, but remained on the Senate staff for only a short period. He left for a better position.

After Durso's defeat in the special election, the local government coordinators apparently did nothing but prepare for the 1986 Senate races. In early June, Sanzillo met with the entire local government coordinating staff and targeted those districts in which a special effort would be made to elect Democratic Senators. Later that month, the downstate local government coordinators were assigned to specific campaigns. Campaigning began in earnest by the end of the July 4th weekend, when the legislative session ended.

As the 1986 general election campaign season began, various Senate employees were assigned by defendants to work full time on the campaigns of several Democratic candidates. Ten of these employees worked exclusively on the following individual campaigns during the time periods indicated:

| Employee: | | Time Period: | Campaign(s): |
|---|---|---|---|
| (1) | William Green | 06/86-12/86 | Montalto |
| (2) | David Keisman | 04/86-12/86 | Durso |
| | | | Orazio |
| (3) | Mark Canu | 06/86-12/86 | Durso |
| | | | Orazio |
| | | | Berman |
| | | | McDonald |
| (4) | Diane DeVito | 09/86-12/86 | Quattrociocchi |
| (5) | William Gelfond | 06/86-12/86 | McDonald |
| (6) | Timothy Kaiser | 06/86-12/86 | Durso |
| | | | Morgan |
| (7) | Elizabeth Meyer | 06/86-12/86 | Durso |
| | | | Oppenheimer |
| (8) | Larry Schwartz | 03/86-12/86 | Durso |
| | | | Quattrociocchi |

| (9) | Glen Vanbramer | 10/86-12/86 | Montalto |
| (10) | Barbara Zebersky | 01/86-12/86 | Oppenheimer |
| | | | Markowitz |
| | | | Durso |
| | | | Montalto |
| | | | Berman |

Even though none of these employees performed any legislative duties while working on the campaigns, Ohrenstein and Sanzillo, and in one case, Quattrociocchi, signed payroll certifications representing that they had, in fact, performed "the proper duties" of their respective Senate staff or commission positions. For instance, Elizabeth Meyer, who joined Ohrenstein's staff in July 1985, was assigned to oversee the daily operation of the Oppenheimer campaign and to be liaison with local district leaders. Similarly, William Gelfond, listed on Ohrenstein's payroll as a "Special Assistant to the Minority," was assigned to manage the McDonald campaign. Even though he was a full-time law student in Washington, D.C., at the time, Gelfond was paid $2,400 biweekly in exchange for his services. Timothy Kaiser, one of the local government coordinators, was assigned to manage the Morgan campaign, and Larry Schwartz and Mark Canu, the directors of the upstate and downstate branches of the local government coordinators, who had worked on the Durso special election effort, were later assigned to manage the campaigns of Senator Quattrociocchi and candidate Angelo Orazio, respectively.

Several employees who were on the payrolls of legislative commissions were also assigned to work full time on election campaigns. Specifically, William Green, who, as already noted, was on the payroll of the Legislative Commission to Revise the Social Services Law, was assigned to manage Montalto's campaign. Similarly, David Keisman, who was placed on the payroll of the Commission on Toxic Waste by Sanzillo in November 1985, did not perform any work for that commission but was paid $7,800 in exchange for writing advertisements used in the Orazio campaign; he had performed a similar function in the Durso campaign.

In at least one instance, the assignment of Senate employees to full-time duties for individual campaigns entailed transfers from one payroll to another. Glen Vanbramer, an experienced speech writer, was hired by Senator Martin Markowitz on a part-time basis in January 1986, at a $12,000 stipend for the year, to write press releases concerning the Senator's

relationship with a trust company. Vanbramer wrote press releases from February to June 1986, but, in September 1986, apparently at Montalto's urging, he was asked to work full time on the Montalto campaign. Since he had been paid only $5,000 for his work for Markowitz, Vanbramer agreed to work on the Montalto campaign if Sanzillo would assure him that he would be paid $7,000, the balance due from Senator Markowitz. Sanzillo agreed to this arrangement, placed Vanbramer on the Senate payroll at the end of October for the balance of the year, and signed payroll certifications authorizing the promised salary payments to him.

In addition to assigning full-time campaign duties to employees who were already on the Senate payroll, defendants also hired 26 individuals for the express purpose of working full time on the campaigns of seven Democratic senatorial candidates, including Senators Oppenheimer and Quattrociocchi, who were running for reelection, and candidates Berman, McDonald, Montalto, Morgan and Orazio, who were seeking either to regain lost seats or to capture the seat for the first time. These employees, who were placed on commission or staff payrolls during the course of the 1986 election campaigns, were:

| Employee: | | Time Period: | Campaign(s): |
|---|---|---|---|
| (1) | Bruce Fleishman | 08/86-12/86 | Oppenheimer |
| (2) | Steven Schlau | 10/86-12/86 | Orazio |
| (3) | Ingrid Stettner | 07/86-11/86 | Morgan |
| (4) | MaryRose Stevenson | 09/86-12/86 | Quattrociocchi |
| (5) | Mark Bloom | 07/86-12/86 | McDonald |
| (6) | Jeffrey Feldman | 05/86-12/86 | Durso Orazio |
| (7) | Susan Savage | 07/86-12/86 | Morgan |
| (8) | Andrew Tulloch | 07/86-12/86 | Oppenheimer |
| (9) | Estelle Bressler | 06/86-11/86 | Berman |
| (10) | Paul Doell | 08/86-11/86 | Montalto |
| (11) | Jackie James | 10/86-11/86 | McDonald |
| (12) | Patrick Prefetti | 06/86-12/86 | Morgan |
| (13) | Gerard Riconda | 10/86-12/86 | McDonald |
| (14) | James Surdoval | 10/86-12/86 | McDonald |
| (15) | Carrie Tishelman | 09/86-11/86 | McDonald |
| (16) | Carmen Del Priore | 08/86-11/86 | [did no work for Legislature or any campaign] |
| (17) | Elaine Fleischer | 05/86-11/86 | Orazio |

| (18) | Michael Katims | 07/86-12/86 | [conducted investigations of Republican incumbents] |
| (19) | Linda Mepsted | 10/86-12/86 | Quattrociocchi |
| (20) | Amy Nunziella | 07/86-11/86 | Berman |
| (21) | Denise Pratesi | 06/86-12/86 | [conducted polling for various campaigns] |
| (22) | C. Theodosiou | 03/86-11/86 | Berman |
| (23) | Pauline Toole | 07/86-11/86 | Oppenheimer |
| (24) | Robert Weingarten | 04/86-04/86 | Durso |
| (25) | Clifford Wilson | 07/86-12/86 | Berman |
| (26) | Jurgen Worthing | 05/86-11/86 | Orazio |

All but five of these employees worked exclusively on campaign-related matters. The other five worked extensively on campaign activities. Nevertheless, they were paid from the State treasury based on the representations made by Ohrenstein, Sanzillo, Babbush and Quattrociocchi that they had performed "the proper duties" of the legislative positions to which assigned.

As already noted, Jeffrey Feldman, hired to work on the Durso special election, was, after the Durso campaign ended, assigned to the Orazio race, as were Elaine Fleischer, Jurgen Worthing and Steven Schlau, who were hired to work full time on that campaign. Orazio, a Democratic Assemblyman, requested that Fleischer and Worthing, members of his Assembly staff, be hired to work on the campaign. After learning that Fleischer and Worthing were being paid from the Senate payroll rather than from campaign funds, Orazio urged them to seek full-time positions with the Senate minority, which Worthing evidently did. During the course of the campaign, however, Sanzillo and Orazio had a dispute, which led Sanzillo to threaten to remove Fleischer and Worthing from the Senate payroll if the Orazio campaign did not show improvement.[3] After Orazio lost the election, the employment of both

---

3. In addition to those hired in 1986 to work on Orazio's campaign, six individuals already on the Senate payroll were assigned to work in that campaign, including Canu, who served as campaign manager, Keisman, who wrote campaign literature, and four other Ohrenstein staff members, whose employment is not at issue. After the dispute between Orazio and Sanzillo, all of these individuals, along with Jeffrey Feldman, were reassigned to either the Berman or McDonald campaigns.

Fleischer and Worthing was terminated. Schlau, on the other hand, was retained and placed, in January 1987, on the payroll of the Commission on Public-Private Cooperation, for which he did not do any work. He was paid retroactively from October 1986 for his services in the Orazio campaign and paid prospectively for his work as a local government coordinator.

Among the 26 employees hired to work on the 1986 campaigns were Paul Doell and Carmen Del Priore, both of whom were assigned to the Montalto campaign.[4] Doell, hired at Montalto's request to act as a campaign press person, write letters to newspaper editors, and draft campaign literature, was told by Montalto that he would be paid from $100 to $125 per week from the "Senate Democrats". At Montalto's urging, Sanzillo placed Doell on the payroll of the Commission on Long Island Water Resources in or about August 1986. During the campaign he performed writing assignments for Montalto and received $1,800 from the commission's payroll.

Although Del Priore, who was apparently placed on the payroll solely to compensate a third person for working on the Montalto campaign, was also ostensibly assigned to that campaign, she never performed any work for either the Senate or the campaign. Andy Diorio, a member of a Brooklyn Democratic club, had been offered a State job in exchange for his work in printing Montalto's campaign literature. Since Diorio was already employed by the State, he told Montalto that Del Priore, the daughter of another member of the club, was unemployed and "needed a job". At Montalto's request, and in consideration for Diorio's work on the campaign, Del Priore was placed on the Senate payroll as an "Administrative Assistant to the Minority", on or about August 21, 1986. For 10 weeks, until her services were terminated following the election, Del Priore received biweekly checks.

Mark Bloom, who was hired ostensibly as a local government coordinator at the end of June 1986, was assigned to the McDonald campaign to act as the candidate's liaison with Democratic leaders in the district. Others hired in 1986 to work on the McDonald campaign were Carrie Tishelman, Gerard Riconda, Jackie James and James Surdoval. Tishelman and Riconda were placed on the staff of the Commission

---

4. Others assigned to the Montalto campaign included Vanbramer, at least three other Ohrenstein staff members and one member each from the staffs of Senators Weinstein and Halperin. The Ohrenstein staff members worked on the Montalto campaign on a full-time basis, while the staff members provided by the other two Senators worked part time.

on Toxic Substances, but worked full time on the campaign. James, who was told to leave her job title blank on her employment forms, acted as a "gofer" for the campaign and ultimately received a $1,400 paycheck from the Commission on Rural Resources. Surdoval, who had sought $5,000 to write campaign literature for McDonald, received his fee through the payroll of the Administrative Regulations Review Commission.[5]

Former Assemblyman Clifford Wilson, who was hired to manage Carol Berman's campaign, was offered $40,000 for his services, $30,000 of which would come from the Senate payroll, with the remainder from the funds of the SDCC. Wilson was placed on Senator Babbush's payroll as a "Counsellor to the Minority" and the Senator personally signed at least one payroll certification bearing Wilson's name. When the SDCC's portion of the funds that were to go toward Wilson's compensation did not materialize, he received a corresponding raise in his Senate salary, which, at Ohrenstein's request, was processed through Babbush's office. Wilson ultimately received a total of $36,000 from the Senate payroll in exchange for his services.

Besides Wilson, several others were hired to work exclusively on Berman's campaign. Constantine Theodosiou, a full-time student, was placed on Ohrenstein's payroll in March 1986 to do part-time clerical work. After Berman announced her candidacy, Theodosiou began doing full-time advance work for the campaign and eventually was assigned to be Wilson's driver. Amy Nunziella was similarly placed on the Senate payroll, at a salary of $200 per week, to drive Wilson from his home in Queens to the Long Beach campaign headquarters each day. Estelle Bressler also worked full time on the Berman campaign starting in April 1986 at a salary of $500 per week. After the election, when her employment was terminated, she learned that she had been paid as a member of the staff of the Commission on Water Resource Needs on Long Island.[6]

---

5. In addition to Bloom, Tishelman, Riconda, James and Surdoval, at least five other Ohrenstein staff members, and one member each from the staffs of Senators Connor, Halperin, Markowitz and Solomon were assigned to the McDonald campaign.

6. In addition to Theodosiou, Bressler and Nunziella, at least five other members of Ohrenstein's staff worked on Berman's campaign on a full-time basis. Members of the staff of two other Senators also worked on this campaign, apparently on a volunteer basis.

Bruce Fleishman, Andrew Tulloch and Pauline Toole were placed on the Senate payroll in 1986 to work on the campaign to reelect Senator Suzi Oppenheimer.[7] Fleishman was placed on the payroll of the Commission on Rural Resources in July 1986; he did not perform any services for the commission, however, and, instead, did general work on the Oppenheimer campaign, such as answering telephones. Similarly, in mid-June 1986, Tulloch was placed on Ohrenstein's payroll at an annual salary of $40,000 as counsellor to the minority. Although assigned briefly to Oppenheimer's district office, Tulloch was sent to the Senator's reelection campaign headquarters when it opened.

Toole, who previously had been a student intern in Senator Oppenheimer's Albany office, was interviewed by Sanzillo on July 15, 1986 and placed on Ohrenstein's payroll as a "research analyst" from July 31 until mid-November. On August 1, 1986, she was assigned to coordinate a letter-writing campaign at Oppenheimer's New Rochelle campaign headquarters and told to use a pseudonym when dealing with the press, so as not to disclose her Senate affiliation.[8]

Linda Mepsted and MaryRose Stevenson were hired in 1986 to work on the Quattrociocchi campaign.[9] Although Stevenson had been hired by Larry Schwartz, Quattrociocchi's campaign manager, there was testimony before the Grand Jury that Stevenson, who had been placed on the payroll of the Commission on Public-Private Cooperation, spent a part of September and early October arranging a legislative hearing concerning windfall profit tax issues. The testimony was equivocal, however, and did not reveal the extent to which she performed legislative, as opposed to nonlegislative, functions.

Susan Savage, Ingrid Stettner and Patrick Prefetti were hired in 1986 to work on the Morgan campaign.[10] Savage did

---

7. In addition to these three 1986 campaign workers, other Senate employees assigned full time to the Oppenheimer campaign included Elizabeth Meyer, one person each from the staffs of Senators Babbush and Halperin, and all the members of Oppenheimer's own staff.

8. Others involved in the 1986 campaign followed a similar practice. For instance, at least once during the campaign, Larry Schwartz used the name Jeff McCann when issuing a press release.

9. In addition to Mepsted and Stevenson, several others, including Tom Cetrino and Larry Schwartz, at least one other member of Ohrenstein's staff and one member of Senator Perry's staff, who were on the Senate payroll before the 1986 campaign season began, were assigned to work full time on the Quattrociocchi reelection campaign.

10. In addition to Prefetti, Stettner and Savage, three members of Ohrenstein's staff also worked full time on Morgan's campaign.

only campaign work from July 1986, when she was placed on Ohrenstein's staff, until January 1987, when she received legislative assignments. Robert Bergin testified that Prefetti, who was hired in June to do advance work for the campaign, and Stettner, who was hired in July to work on the campaign, were on the payroll of the Dairy Commission and may have prepared a report for that commission in October 1986. Bergin, however, never personally saw the purported report and only learned of its existence from one of his staff members.

Although most of the 26 employees hired to work on the 1986 election campaign effort were assigned to specific campaigns, a few were not. For example, in or about July 1986, Michael Katims, a private investigator, was placed on Ohrenstein's payroll at a weekly salary of $250 to verify the educational resumés and biographical backgrounds of incumbent Republican Senators. Ohrenstein signed a recommendation for employment, stating that Katims would be a "research analyst" on his staff. Although assigned to investigate two Republican incumbents, Katims was unable to contact Sanzillo to render his report and never spoke to Ohrenstein. By year's end, Katims had received $10,000 from the Senate payroll.

Similarly, in June 1986, Denise Pratesi, a school teacher, was placed on Ohrenstein's payroll as a research analyst at a biweekly salary of $800. Pratesi was, in fact, "the polling coordinator" for the campaign effort and ran the Democrats' polling operations from a campaign headquarters in Westchester. She had been hired as the polling coordinator in every election year from 1980 to 1986 following the end of the school term.

Notwithstanding defendants' efforts and their use of State funds to compensate their array of campaign workers, the Democratic party did not obtain control of the Senate in the 1986 election. Incumbent Senators Oppenheimer and Quattrociocchi were reelected, but candidates Berman, McDonald, Montalto, Morgan and Orazio all lost their bids for election to the Senate.

Following the election, many of those hired during the campaign were removed from the Senate payroll.[11] Eight of

11. The employees whose services were terminated as of November 12, 1986 included Bressler, Doell, James, Tishelman, Del Priore, Fleisher, Nunziella, Theodosiou and Worthing; Toole's services were terminated as of November 14, 1986. In addition, the services of Prefetti, Riconda, Surdoval,

the 26, however, were retained beyond the end of 1986. Three, Bloom, Feldman and Savage, were local government coordinators who remained on Ohrenstein's payroll in the same positions. The five others, Fleishman, Schlau, Stevenson, Stettner and Tulloch, were transferred to different payrolls after the election or at the end of the year.

On or about November 6, 1986, Sanzillo wrote to the local government coordinators and gave them a month-long vacation until a meeting scheduled for December 4, 1986 at Ohrenstein's Manhattan office. At that meeting, Sanzillo discussed the campaign and a special session of the Legislature then in progress. He also announced that the entire staff would be given off until January 5, 1987. The local government coordinators were assigned to cover specific districts and told to report to the office on a full-time basis.

After considering this evidence, the Grand Jury returned a 665 count indictment charging that from January 1, 1986 to January 1, 1987 Ohrenstein, Sanzillo, Babbush, Montalto and Quattrociocchi[12] conspired to commit grand larceny and to offer false instruments for filing by agreeing to place individuals on the State payroll to work exclusively on Democratic State Senate campaigns and by "us[ing] legislative employees paid from the Treasury of the State of New York" to engage in full-time work "on election campaigns on behalf of Democratic candidates for the State Senate". In addition, the Grand Jury charged that defendants conspired to "prepare, sign, submit and file with the appropriate public servant or office documents falsely certifying that [Senate] employees were performing legislative duties when, in fact, they were working on election campaigns[,] and [also] documents placing campaign workers on the State payroll which falsely represented that these employees would be performing legislative duties, when, in fact, they would be working solely on election campaigns."

The indictment also charged 200 overt acts in support of the conspiracy charge, including, *inter alia,* allegations that defendants placed specific individuals on the payrolls of legislative commissions or Senate staffs and "signed the appropriate

---

Katims, Mepsted, Pratesi and Wilson were terminated as of the end of 1986. Weingarten, who had been hired during the Durso campaign, resigned long before election day.

12. For reasons not apparent in the record, the People do not appeal from the dismissal of those counts of the indictment pertaining exclusively to defendant Quattrociocchi.

documents certifying that" they, and others already on the State payroll, were "performing legislative duties" during particular periods of time in 1986 when, in fact, these individuals were working exclusively on the 1986 Democratic State Senate campaigns or performing other general campaign services.

In addition to the conspiracy charge, the indictment set forth 664 substantive counts which related to the employment of 39 individuals who were paid with State funds either for performing no duties whatsoever or for rendering only campaign services.[13] The substantive charges also included, against Ohrenstein and Sanzillo only, six theft of services counts, which arose from their use of Senate staff members. All the defendants except Quattrociocchi were also charged with defrauding the government from November 1, 1986 to December 24, 1986, "by engaging in a scheme constituting a systematic ongoing course of conduct with intent to defraud [and to obtain property from] the State of New York * * * by means of false and fraudulent pretenses, representations and promises" through which they obtained "property with a value in excess of one thousand dollars from New York State."

The remaining 657 substantive counts charged defendants, individually or in various combinations, with grand larceny in the second and third degrees and offering a false instrument for filing in the first degree. Most of these charges arose from defendants' use of State money to compensate Senate employees for working solely on partisan political campaigns. Specifically, the grand larceny counts charged that defendants had stolen property in excess of the requisite statutory amounts "in that they [or he] caused a salary to be paid to" each employee over the course of the period in which the employee engaged exclusively in campaign duties. The false instrument counts, which relate to payroll documents certifying that each employee had performed legislative duties, charged that for each payroll period in which an employee was paid for working solely on campaign activities, defendants, "knowing that a written instrument * * * contained a false statement . and false information" had, with the requisite intent and knowl-

---

**13.** These employees included 10 who were already on the State payroll and were assigned exclusively to perform campaign services during the 1986 campaign, 26 employees placed on the payroll to perform campaign work, one, Wolff, who had been on the payroll for some time and who had performed only political fund-raising work, and two, Smith and Walsh, who had performed no work and were essentially "no-show" employees.

edge, "offered and presented said written instrument to a public office, namely, the New York State Senate". Although the bulk of the grand larceny and false instrument charges involved employees who were involved in the 1986 campaign, some of the counts related to "no-show" or "campaign only" employment arrangements made prior to the 1986 conspiracy.

Defendants subsequently moved to dismiss the indictment, claiming, *inter alia,* immunity from the prosecution of these charges under the Speech or Debate Clause of the NY Constitution and under separation of powers principles in that the indictment constitutes an unlawful intrusion into legislative affairs. After reviewing the indictment and the evidence presented to the Grand Jury, the motion court (139 Misc 2d 909) concluded that 36 of the 39 individuals whose employment was at issue could be placed in 1 of 3 categories:

*Category 1:* 10 individuals who were employed prior to 1986 and were used in the 1986 campaigns.

*Category 2:* eight individuals who were hired during the 1986 campaigns and were retained during the 1987 legislative session.

*Category 3:* 18 individuals who were employed only during the 1986 campaigns.

As to the three not so classified, two, Smith and Walsh, were categorized as "no-show" employees since they were on the Senate payroll but performed no services at all. The employment of the other, Arlene Wolff, was at issue only for a period prior to 1986 and therefore did not fit into any of the established categories. Since, however, her situation was most analogous to that of a Category 2 employee, the court treated her as such. In addition, one person, Barbara Zebersky, was determined to be a Category 1 employee for one period of time and a "no-show" for another.

After so categorizing the employees, the court addressed defendants' claims and ruled that the protection of the Speech or Debate Clause extends only to legislative acts, that is, those acts which form an integral part of the deliberative and communicative processes by which members of the Legislature participate in considering the passage or rejection of legislation. Thus, the court concluded that the political activities which are the subject of the indictment were not legislative acts, and therefore rejected defendants' asserted speech or debate immunity with respect to most of the employees in issue.

Specifically, the courts noted that, with the exception of five individuals, there was no evidence that any staff member whose employment was at issue had ever engaged in any activity "even remotely legislative in purpose". It found that there was some evidence that Patrick Prefetti and Ingrid Stettner, who had been on the payroll of the Dairy Commission while working on the Morgan campaign, had produced a report for that commission in October 1986. It also noted that Pauline Toole testified that, while working on the Oppenheimer campaign, she had prepared informational brochures for constituent distribution. In addition, the court found some evidence that MaryRose Stevenson had arranged a legislative hearing while working on the Quattrociocchi campaign, and that Diane DeVito had fed some constituent information into a computer while programming it for the Quattrociocchi campaign.

After finding that preparing informational brochures and transmitting constituent information were not legislative acts within the meaning of the Speech or Debate Clause, the court concluded that an inquiry into the activities of Toole and DeVito would not constitute an intrusion into the legislative process. Since it found, however, that preparation of commission reports and arranging legislative hearings were legislative acts, the court concluded that an inquiry into the activities of Prefetti, Stettner and Stevenson might intrude into the legislative process.

Although recognizing that, in considering a motion to dismiss an indictment, a court is required to disregard testimony contrary to the People's theory of prosecution, the court determined that such requirement must give way to the values protected by the Speech or Debate Clause. It therefore ruled that "one evidence appears that the activity under investigation is arguably within a proper legislative sphere, the prosecutor as representative of the executive branch must establish that the prosecution will not encompass privileged legislative acts" (supra, 139 Misc 2d, at 925). Accordingly, it concluded, a legislator is under no burden to demonstrate that the acts in question were legislative in nature.

Since there was some evidence to suggest that Prefetti, Stettner and Stevenson had engaged in acts that arguably could be considered legislative, the court ruled that the People had failed to meet this standard with respect to these three employees. It, therefore, dismissed all the counts of the indict-

ment relating to them. The court, however, refused to dismiss, under the Speech or Debate Clause, any counts relating to other employees in any of the three categories. In addition, it refused to dismiss any counts relating to the "no-show" employees, reasoning that since they failed to perform any duties, there could be no argument that their function was legislative.

In considering whether separation of powers principles, other than the Speech or Debate Clause, were implicated by this prosecution, the court found that even though the political activities at issue were not legislative acts protected by the Speech or Debate Clause, they might nonetheless be legitimate functions of the office of a State legislator. In urging that their prosecution was barred by the separation of powers doctrine, defendants argued, *inter alia,* that the courts cannot review the manner in which funds designated for legislative staff salaries are spent and that there are no judicially discoverable and manageable standards for delineating the proper duties of a staff member.

In rejecting this argument, the court found that the judiciary could determine whether salaries paid to Senate staff members for political activities were permissible within the limitations imposed by article VII, § 8 of the NY Constitution, which provides: "The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private undertaking". Ruling that since partisan political activities constitute private, rather than public, functions, it found that the expenditure of State funds to pay individuals to work in political campaigns constitutes an unconstitutional private application of public revenues.

The court also concluded that article VII, § 8, sets forth judicially discoverable and manageable standards relevant to the use of State funds for political purposes. Applying this standard, it determined that the payments to 31 of the 36 employees cited in the indictment apparently violated the limitations thus imposed. The court, however, noted that Ohrenstein, as Minority Leader, has broad discretion to determine the schedules, attendance and duties of his employees. Noting both the lack of any requirement that employees perform any specific duties with respect to the position to which they were appointed, or even a job description or a policy for vacations or compensatory time and that members of the Legislature are permitted to use budget lines interchangeably and to retain employees on the payroll in anticipa-

tion of future needs, it reasoned that a Senator's representation in a payroll certification that an employee had performed legislative duties " 'for the period specified' must be broadly construed to include entitlement to salary for the previous performance of services of value to the Legislature". *(Supra,* 139 Misc 2d, at 949.) Furthermore, it held, since the Legislature had not expressly empowered the courts to adjudicate disputes arising from a Senator's decision to pay an employee for such past services, courts could not entertain a prosecution based on such a dispute, absent a "patent" constitutional violation.

The court concluded that the evidence before the Grand Jury did not establish so patent a violation of the constitutional limit on appropriations of public funds for private purposes as to justify a prosecution with respect to employees who performed services of value to the Legislature either prior or subsequent to the 1986 elections. It ruled that such a prosecution raised a nonjusticiable question relating to the internal administration of the Legislature, and therefore dismissed all the counts of the indictment relating to the Category 1 employees, except Zebersky, and Category 2 employees, except Wolff. It also dismissed, on the same grounds, the count of defrauding the government. The court, however, upheld the counts relating to the Category 3 employees, except Toole and Prefetti, and the "no-show" employees on the ground that payments made to these individuals were patently unconstitutional misapplications of public funds.

As a result of its decision on the substantive counts, the court also modified the conspiracy count of the indictment to strike any allegation that defendants had conspired to assign previously hired Senate employees to perform only campaign duties, and barred the People from adducing any evidence of such conspiracy.[14]

Since, in my view, the motion court's decision misconstrues the spirit and tenor of the Speech or Debate Clause, and unreasonably extends its protections to shelter defendants' use

14. In a subsequent order, the court denied defendants' motions to dismiss the indictment on all other grounds, including due process, the election and public officers statutes, legal insufficiency, defective Grand Jury presentation and defective indictment. It also denied motions by defendants Sanzillo, Montalto and Babbush to sever their cases, by Montalto and Babbush based on claims of selective prosecution and the interests of justice and by Ohrenstein based on the Statute of Limitations. This determination is, for the most part, the basis of defendants' article 78 proceeding.

of public funds to pay employees to work on political campaigns, conduct which is, on its face, criminal, and does not constitute an internal legislative prerogative immunized by separation of powers principles, I would reinstate the dismissed and modified counts of the indictment, except as to defendant Quattrociocchi, with respect to which the People do not appeal, as well as deny the relief sought in the article 78 proceeding, and dismiss that proceeding.

The Speech or Debate Clause of the NY Constitution provides that "[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place." (NY Const, art III, § 11.)[15] While speech or debate immunity has been extended beyond speeches and debates occurring inside the legislative chamber *(see, e.g., Kilbourn v Thompson,* 103 US 168, 204), "[t]he gloss going beyond a strictly literal reading of the Clause has not, however, departed from the objective of protecting only legislative activities." *(Hutchinson v Proxmire,* 443 US 111, 125.) Since the immunity was intended to foster "the integrity of the legislative process" *(United States v Brewster,* 408 US 501, 507), the courts have taken "a decidedly jaundiced view towards extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings." *(Gravel v United States,* 408 US 606, 620.)

Thus, it has generally been held that the Speech or Debate Clause does not immunize legislators and their aides for all acts conducted in their official capacities. They are insulated only to the extent that "legislative acts" or the motives underlying them are directly at issue. *(See, e.g., Eastland v United States Servicemen's Fund,* 421 US 491, 504, 505; *Chastain v Sundquist,* 833 F2d 311, 314, *cert denied* — US —, 108 S Ct 2914.) Moreover, "legislative acts" comprise only those activities of legislators which form "an integral part of the deliberative and communicative process by which [they] participate in committee and [legislative] proceedings with respect to the consideration and passage or rejection of proposed

---

**15.** Since, as the motion court noted, this provision has rarely been interpreted by the courts of this State, it relied extensively upon Federal cases construing the Speech or Debate Clause of the US Constitution, which provides that "for any Speech or Debate in either House, [Senators and Members of the House of Representatives] shall not be questioned in any other Place" (US Const, art I, § 6).

legislation" *(Gravel v United States, supra,* 408 US, at 625; *see, Doe v McMillan,* 412 US 306, 313, 314).

Since a legislator or his aide is entitled to the immunity of the Speech or Debate Clause only to the extent that either the performance of a past legislative act or the motivation behind it is at issue *(see, e.g., United States v Brewster, supra,* 408 US, at 510-513; *United States v Johnson,* 383 US 169, 184-185), if the government is not required to present such proof on its direct case, the legislator accused of violating the criminal law cannot claim the immunity. *(See, e.g., United States v Helstoski,* 442 US 477, 488-490, n 7.) Not only does the prosecution of this indictment not require proof of any legislative act, it is, in fact, premised on the charge that defendants falsified documents to enable State employees to be paid for performing nonlegislative acts.

Notwithstanding, the motion court concluded, as does the majority, on the basis of equivocal Grand Jury testimony indicating that Stevenson, Stettner and Prefetti may have performed a few isolated legislative acts during the 1986 campaign, that the Speech or Debate Clause required the dismissal of all the counts relating to these employees. By holding that evidence of the performance of isolated legislative acts by full-time campaign workers immunizes a nonlegislative act, i.e., the use of State funds to compensate public employees for performing campaign work for the benefit of private individuals, the court misconstrued the substantive protections of the Speech or Debate Clause and created an unwarranted expansion of the protections afforded to legislators under it. Moreover, in an effort to accommodate its unprecedented view of the Speech or Debate Clause, the court erred by going beyond the indictment's facial allegations and placing upon the People the burden of proving, on a motion to dismiss, that the prosecution would not involve proof of legislative acts.

In dismissing the charges relating to these three employees, the court reasoned that the People could not possibly prove that defendants had intentionally filed false certifications without also "inquiring into [the] specifics of their legislative assignments, the amount of time spent performing them, * * * the results" and defendants' "motives in assigning legislative duties." *(Supra,* 139 Misc 2d, at 924-925.) In so concluding, the court relied upon a series of Federal circuit court opinions which hold that congressional employment decisions cannot be challenged in the context of a civil employment

discrimination suit when the employee's duties include legislative acts within the meaning of the Speech or Debate Clause. Nothing in the indictment or the cited cases, however, supports the conclusion that the People, in order to prove the charges arising from the employment of Stevenson, Stettner and Prefetti, are required to offer evidence that even remotely touches upon any legislative act allegedly performed by these three employees.

As already noted, the Speech or Debate Clause immunizes legislators only to the extent that proof of a legislative act is necessary to establish, on the People's direct case, that the defendant committed the crimes charged. *(See, e.g., United States v Brewster, supra,* 408 US, at 510-513; *United States v Johnson, supra,* 383 US, at 184-185; *cf., United States v Helstoski, supra,* 442 US, at 488, n 7.) Here, of course, the whole thrust of the indictment is that defendants hired and paid individuals with State money for performing services which did not constitute legislative acts, or, for that matter, acts falling within the legitimate scope of any conceivable public employment. In fact, the false instrument counts are specifically premised upon the allegation that no "legislative duties" were performed during the periods for which each payroll certification was submitted.

Thus, that some of these employees may have performed a few isolated legislative acts need not be proven to establish the crime of larceny or the falsity of the payroll certifications. The People need only prove, beyond a reasonable doubt, that defendants intentionally used State funds to compensate the employees in question for the performance of private acts, not legislative acts immunized under the Speech or Debate Clause, nor even nonlegislative acts that fall within the legitimate sphere of public employment. Consequently, defendants' motives or intentions in assigning legislative tasks are irrelevant. The People are required to prove only that defendants intended to use State funds to purchase the performance of private acts. This burden can be satisfied without any evidence pertaining to a legislative act insulated from examination by virtue of the Speech or Debate Clause. Defendants, of course, may attempt to prove that Stevenson, Stettner and Prefetti did, in fact, perform legislative acts,[16] but this does

---

**16.** The performance of an isolated legislative act would not necessarily constitute a defense to the false instrument count covering the period during which the act was performed since the performance of only nominal

not entitle them to a dismissal of the charges before trial. *(See, e.g., Government of Virgin Is. v Lee,* 775 F2d 514, 525; *United States v Myers,* 635 F2d 932, 942, *cert denied* 449 US 956.)[17]

Taken to its logical conclusion, the motion court's decision would permit a legislator effectively to define the scope of his own immunity and place himself beyond the reach of a prosecution for blatantly criminal acts. He could, for instance, employ a staff member to perform a variety of personal services over the course of a year, cause the State to pay for these services through fraudulent payroll certifications, and insulate himself from prosecution by assigning a momentary, but nonetheless colorable, legislative act to the employee.[18] Under the court's rationale, it would not matter that the purported report prepared by Stettner and Prefetti had been completed in less than a day. Nor, apparently, would there have been any constitutional reason not to dismiss the counts relating to their employment had they devoted the remainder

---

legislative duties does not constitute a defense. *(See, e.g., United States v Diggs,* 613 F2d 988, 1002, *cert denied* 446 US 982 [affirming false statement conviction of Congressman based upon his failure to disclose on payroll forms that "only a nominal percentage of (two employees') responsibilities were congressionally related"].) Plainly, the performance of a legislative act during one payroll period would not constitute a defense to a false instrument or larceny count arising from certifications covering other payroll periods during which no legislative acts were performed.

**17.** To cover situations in which a defendant may choose to present legislative acts in his own defense, the Third Circuit has formulated a procedure which "balances the legislative interest in protection from prosecution for legislative acts and the executive interest in punishing fraudulent * * * claims." *(Government of Virgin Is. v Lee,* 775 F2d 514, 525.) The court there held that when a legislator is charged with falsely characterizing nonlegislative acts as legislative in nature, the trial court must first determine whether the defendant has proven by a preponderance of the evidence that particular acts constitute immunized legislative activities. *(See, supra,* at 524-525.) After making this determination, the court must submit to the jury the question whether the representations made regarding the defendant's nonlegislative acts were material. *(See, supra,* at 525.) And, if the prosecution proves beyond a reasonable doubt that the defendant's misrepresentations were material, then "it will be for the jury to determine his guilt." *(Supra,* at 525-526.) There is no reason why this approach cannot be employed here.

**18.** *(See, e.g., United States v Diggs,* 613 F2d 988, 1001-1002 [Congressman used payroll of House of Representatives to compensate a woman who worked 80% of her time on bookkeeping for Congressman's funeral home and to pay for private services rendered by an accountant]; *see also, United States v Bramblett,* 348 US 503, 504 [Congressman falsely represented that a woman placed on the House of Representatives' payroll "was entitled to compensation as his official clerk"].)

of their time to candidate Morgan's housework instead of the advance work for his campaign. Moreover, as the People argue, Ohrenstein could hire a construction crew to remodel his apartment, pay them for such services from the State treasury, and escape all criminal liability by having the construction foreman write a one-sentence report which might, one day, be applicable to some proposed legislation. None of the cases construing the Speech or Debate Clause justifies such a blatant misuse of public funds, or places such conduct beyond the pale of judicial review.

Particularly inapposite here is the line of Federal employment discrimination cases upon which the motion court relied, i.e., *Browning v Clerk, U. S. House of Representatives* (789 F2d 923, *cert denied* 479 US 996), *Agromayor v Colberg* (738 F2d 55, *cert denied* 469 US 1037), and *Walker v Jones* (733 F2d 923, *cert denied* 469 US 1036). In each of these cases the courts were faced with allegations by individuals that they had been either denied, or discharged from, employment with legislative bodies based on their sex, race, political affiliation or national origin. In each case, the court, in resolving the question of immunity, looked to the extent to which judicial review of the employment decision would implicate speech or debate immunity. *(Browning v Clerk, U. S. House of Representatives, supra,* 789 F2d, at 928-929; *Agromayor v Colberg, supra,* 738 F2d, at 59-60; *Walker v Jones, supra,* 733 F2d, at 930-932.)*

In *Agromayor (supra,* 738 F2d, at 60) and *Walker (supra,* 733 F2d, at 930-931), the courts concluded that the issue was whether the duties of the position were such that the person occupying it would have "meaningful input" into the legislative decision-making process. In *Browning (supra,* 789 F2d, at 929), the court framed the issue as whether the affected "employee's duties are an integral part of the legislative process, such that they are directly assisting members of Congress in the 'discharge of their functions' ". In *Agromayor,* the court determined that the position of a press officer was sufficiently "legislative" to warrant legislative immunity and, thus, dismissal was appropriate. Similarly, in *Browning,* the court held that there was "little doubt" that the position of Official Reporter was directly related to the legislative process; therefore, dismissal was also warranted. In *Walker,* however, the court ruled that the position of manager of a congressional restaurant was not "legislative" in character.

Unlike *Browning, Agromayor* and *Walker,*[19] defendants here are charged with hiring employees to render private services and compensating them through fraudulent representations which led to a theft of public funds. Inasmuch as the rendition of private services at public expense in no way constitutes an "integral part" of the legislative process, the court's reliance on these cases to support its decision to dismiss the counts pertaining to Stevenson, Stettner and Prefetti is misplaced.

Nor do the discrimination cases support the proposition that once a protected employment decision is made, any subsequent nonlegislative act relating to the employment is also immune. In fact, *Walker (supra)* holds that, even if an employment decision is made in a legislative committee, a subsequent nonlegislative act which implements that immunized decision "is not cloaked with Speech or Debate immunity, for execution or carrying out directions post-dates what the Clause protects—the *process* leading up to the issuance of legislative directions." *(Supra,* 733 F2d, at 932 [emphasis in original]; *accord, Gravel v United States, supra,* 408 US, at 621.) Hence, even if defendants had hired Stevenson, Stettner and Prefetti to engage in legislative acts, the discrimination cases would not support dismissal of the charges arising from the false representations made in the payroll certifications, inasmuch as these were administrative acts occurring after the purportedly immunized employment decisions were made.

Since the Speech or Debate Clause was intended only to protect legislators against unwarranted intrusions into the legislative process, not to provide immunity for conduct clearly unrelated to that process, the dismissed counts pertaining to Stevenson, Stettner and Prefetti should be reinstated. The Speech or Debate Clause should not be applied in such a way as "to make [legislators] super-citizens, immune from criminal responsibility." *(United States v Brewster, supra,* 408 US, at 516; *see also, Gravel v United States, supra,* 408 US, at 624, n 15; *Chastain v Sundquist, supra,* 833 F2d, at 328.) By its expansive interpretation, the motion court's decision, now

---

19. These three cases hardly represent a unanimous line of Federal authority. In *Davis v Passman* (544 F2d 865, *revd en banc on other grounds* 571 F2d 793, *revd* 442 US 228), a Fifth Circuit panel held that a decision to dismiss a legislative employee does not constitute a "legislative act" immunized by the Speech or Debate Clause because when legislators "dismiss employees they are neither legislating nor formulating legislation." *(Supra,* 544 F2d, at 880.)

adopted by the majority, upsets the balance of government power.

Moreover, by its misreading of the Speech or Debate Clause, the motion court was forced to create new procedures, the effect of which would be to increase further both legislative immunity and the ease with which criminal liability could be avoided. Its reliance on the Grand Jury minutes to reach the conclusion, based on a few equivocal passages indicating that Stevenson, Stettner and Prefetti might have performed isolated legislative acts, that defendants were entitled to dismissal of the counts pertaining to these employees, was error because, in reviewing a motion to dismiss, courts must look solely to the facial allegations of the indictment. Federal courts routinely hold that to be the standard of review in deciding pretrial motions to dismiss on speech or debate grounds. *(See, e.g., Government of Virgin Is. v Lee, supra,* 775 F2d, at 524-525; *United States v Carney,* 665 F2d 1064, 1065, *cert denied* 454 US 1081; *United States v Myers, supra,* 635 F2d, at 937; *cf., United States v Murphy,* 642 F2d 699, 700 [holding that the District Court did not err by refusing to review Grand Jury minutes on a motion to dismiss on speech or debate grounds].) In *Carney,* for example, the District of Columbia Circuit held that even if the defendant were correct in asserting that his rights were violated by the introduction of evidence of legislative acts before the Grand Jury, he would not be entitled to dismissal because "only those parts of an indictment which are facially invalid should be dismissed on Speech or Debate Clause grounds." *(Supra,* 665 F2d, at 1065.)

Had the court considered only the facial allegations of the indictment, it could not have granted any part of the motion to dismiss, since not one of the 665 counts makes reference to a speech or debate in the Senate or raises any other matter even remotely connected to the legislative process. *(See, e.g., Gravel v United States, supra,* 408 US, at 620.)* Nor does any count challenge a legislative act or otherwise question defendants' motives for performing any legislative functions. *(See, e.g., United States v Johnson, supra,* 383 US, at 180.)* Instead, the counts involving Stevenson, Stettner and Prefetti, like those pertaining to all the other employees in question, merely recite that defendants committed larceny by causing these employees "to be paid * * * from the New York State Treasury", and filed payroll certifications which were false "in that [they] stated that [the employees] performed legislative duties" during particular periods of time. The filing of a

payroll certification has nothing to do with the consideration of legislation or any other integral part of the work of the Legislature. Indeed, the administrative nature of such an act is virtually self-evident.

Nor do the indictment's allegations raise the spectre that the government must, to prove its case, question the motives underlying any legislative act. Rather, a reading of the indictment reveals that the People question defendants' motives only to the extent that "non-legislative acts were misrepresented as legislative" in the payroll certifications. Such inquiry is permissible in a criminal proceeding and does not involve the interests sought to be protected under the Speech or Debate Clause. *(See, Government of Virgin Is. v Lee, supra,* 775 F2d, at 524.)

Thus, since it is clear that the facial allegations of the indictment do not implicate the Speech or Debate Clause's "fundamental purpose", which is to free "the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator" *(Gravel v United States, supra,* 408 US, at 618), but, instead, demonstrate that the charges arising from the employment of Stevenson, Stettner and Prefetti are not dependent upon proof of legislative acts or the motives underlying them, the court erred by looking beyond those allegations and dismissing the charges on speech or debate grounds.

The court, as already noted, also erroneously placed on the People the burden of proving, on a motion to dismiss, that the prosecution of the charges relating to the employment of Stevenson, Stettner and Prefetti would not require proof of legislative acts. Although there was ample testimony to demonstrate that these three employees were hired to work on the 1986 election campaigns and did, in fact, provide full-time campaign services, the court discounted this evidence and fully credited equivocal testimony that they may have performed some legislative acts during the campaign. Having decided to view the Grand Jury testimony in the light most favorable to defendants, contrary to the rule that a trial court assessing the sufficiency of an indictment on a motion to dismiss must disregard Grand Jury testimony which militates against the People's theory of the case, since credibility is within the exclusive province of the Grand Jury *(see, e.g., People v Jennings,* 69 NY2d 103, 114-115; *People v Pelchat,* 62 NY2d 97, 105; *People v Richards,* 128 AD2d 387, 388), the court compounded its error by placing upon the People the

burden of proving that "the prosecution will not encompass privileged legislative acts."

It is proper to discount, on a motion to dismiss, even exculpatory evidence that may have been presented to a Grand Jury, for such proof raises, at most, "[q]uestions of witness credibility * * * for the trier of fact". *(People v Finley,* 104 AD2d 450, 451; *accord, People v Deegan,* 69 NY2d 976, 979; *People v Warner-Lambert Co.,* 51 NY2d 295, 298-299, *cert denied* 450 US 1031.) Additionally, of course, it is usually the defendant who "has the burden of proving by a preponderance of the evidence every fact essential to support [his] motion" to dismiss an indictment. (CPL 210.45 [7].) Nevertheless, the court declined to follow these well-accepted rules, reasoning that under the Speech or Debate Clause a legislator should not be subjected even to the prospect of a trial in a criminal prosecution when "potentially protected legislative conduct" is implicated. *(Supra,* 139 Misc 2d, at 925.) The court's conclusion that the general rules governing motions to dismiss "must give way to the values protected by the Speech or Debate Clause" *(supra,* at 925) fails to find support in any of the case law on the subject.

Indeed, since a legislator or legislative aide who claims immunity under the Speech or Debate Clause "is asserting a use privilege personal to him, and since the information as to which [activities] were legislative acts is in his possession alone, the burden of going forward and of persuasion by a preponderance of the evidence falls on him." *(In re Grand Jury Investigation Into Possible Violations of Tit. 18,* 587 F2d 589, 597; *accord, Government of Virgin Is. v Lee, supra,* 775 F2d, at 524.) In *Lee,* for example, a Virgin Islands legislator was charged, *inter alia,* with fraudulently concealing the personal nature of a trip when he sought reimbursement for travel expenses by submitting a voucher representing that legislative fact finding was the trip's primary purpose. Relying on a Federal statute which confers speech or debate immunity on Virgin Islands legislators, the defendant claimed an absolute immunity from prosecution because he had engaged in legislative acts during his trip. Although agreeing that legislative fact finding is insulated from prosecution by the Virgin Islands' Speech or Debate Clause, the Third Circuit held that the defendant's mere assertions as to the nature of his activities could not "preclude a court of competent jurisdiction from determining whether [the activities] were, in fact, legislative in nature so as to trigger the immunity." *(Supra,* at 522.) It

was the legislator's burden, the court noted, to prove, by a preponderance of the evidence, that his activities "came within the ambit of legislative fact-finding" so as to be insulated from scrutiny by the Speech or Debate Clause. *(Supra,* at 524.)

Here, after noting that "no evidence was developed about the extent to which [Stevenson, Stettner and Prefetti] engaged in nonlegislative as opposed to legislative activities" *(supra,* 139 Misc 2d, at 924)*, the court fully credited those portions of the Grand Jury testimony which indicated that these employees had performed some legislative acts, and dismissed the counts pertaining to them on the ground that the People had not established that an inquiry into those acts would not be required at trial. The court justified its determination on the ground that "[a]ny other rule would ultimately place a burden on the legislator to prove that the prosecution impinged on an area entitled to speech or debate protection" *(supra,* at 925)*. As *Lee* illustrates, however, it is the legislator's burden to show his entitlement to the Speech or Debate Clause's immunity. In order to obtain a dismissal of the charges arising from the employment of Stevenson, Stettner and Prefetti, defendants were required to show not only that the charges required proof of legislative acts, but also that these individuals had, in fact, performed such acts.

Furthermore, the facts cited by the motion court demonstrate that this misallocation of the burden of proof led to an erroneous result, for the evidence hardly showed by a preponderance that Stevenson, Stettner and Prefetti engaged in legislative acts. While one witness did testify that Stevenson assisted him in arranging a legislative hearing, the Grand Jury was entitled to disregard this testimony and instead to credit other witnesses' testimony showing that Stevenson had performed campaign activities. Similarly, although one witness testified that Prefetti and Stettner may have prepared a report for the Dairy Commission in October 1986, the Grand Jury was entitled to discount that testimony since the witness never saw the purported report and only learned about it from a third party. Thus, it is clear that under a properly allocated burden of proof, the counts pertaining to the employment of Stevenson, Stettner and Prefetti should not be dismissed. Whether these individuals did, in fact, perform legislative acts while being compensated for rendering full-time service to the 1986 campaign effort presents, at best, an issue of fact to be resolved at trial.

Nor, as the majority holds, except with respect to the charges relating to the "no-show" employees, is this prosecution barred by separation of powers principles. The court rejected this argument, at least with respect to the Category 3 employees who were on the Senate payroll only for the duration of the 1986 campaign, holding, "It is a patent violation of our State Constitution [to use the Senate payroll to compensate a person who has performed] work which is of no value to any purpose but the election of a political candidate" (supra, 139 Misc 2d, at 952). Since a prosecution arising from the payments made to these employees would neither evince a "lack of respect for the Legislature" nor necessitate "undue intervention into" the legitimate sphere of legislative prerogatives, the court ruled that the counts pertaining to these employees did not raise separation of powers principles, including the political question doctrine as set forth in Baker v Carr (369 US 186, 217).

The court, however, held that the political question doctrine barred prosecution of the charges arising from the campaign work of the "Category 1" and "Category 2" employees,[20] who performed legislative duties before or after the campaign.[21] It reasoned that defendants' representations in payroll certifications that these employees had performed legislative duties "for the period specified" may have constituted an exercise of legitimate legislative discretion to compensate employees for past legislative services actually rendered, or future services expected to be rendered.

Although noting that the evidence indicated that defendants had, in fact, abused this discretion, the court nonetheless held that a prosecution arising from payments to employees who had performed at least some legislative work is justiciable only if the People could demonstrate a "patent" violation of the Constitution. Since, in its view, the Grand Jury evidence did "not establish so patent a violation * * * as to justify prosecution," the court dismissed all counts arising from payments to these employees, reasoning that such payments involved "nonjusticiable questions regarding the internal ad-

20. The counts pertaining to the employment of Zebersky and Wolff, who did no work for the Legislature at any relevant time but nonetheless were characterized as "Category 1" and "Category 2" workers, respectively, were not dismissed.

21. The court also held that the political question doctrine barred the prosecution of two "Category 3" employees, Toole and Prefetti, who may have rendered some legislative services during the campaign.

ministration of the Legislature's staff, which is in an area peculiarly within the prerogative of the Legislature protected by the Constitution from executive or judicial interference." *(Supra,* 139 Misc 2d, at 951.)

This was error. As aptly argued by the People, "the Speech or Debate Clause embodies all of the separation of powers concerns raised by this prosecution," which is concerned only with the propriety of the conduct of individual legislators. Moreover, even if individual legislators could invoke the political question doctrine, the use of State funds to compensate personnel who work on campaigns does not constitute a legitimate legislative prerogative; nor does a prosecution based on such payments in any way interfere with the internal administration of the Legislature.

Notably, in reaching its conclusion, the motion court failed to cite any case which holds that a legislator who is not entitled to immunity under the Speech or Debate Clause may nonetheless successfully invoke the political question doctrine. In contrast, ample precedent exists indicating not only that the court's holding was incorrect, but that its effect is to alter the balance of governmental power which the separation of powers principle is designed to maintain. For example, in *Davis v Passman* (442 US 228), the Supreme Court rejected a Congressman's attempt to invoke the political question doctrine to defeat a civil employment discrimination action commenced by a former assistant who claimed that she had been fired because of her sex. The court stated, "While we acknowledge the gravity of [the Congressman's] concerns, we hold that judicial review of congressional employment decisions is constitutionally limited only by the reach of the Speech or Debate Clause". *(Supra,* at 235, n 11.) Noting that the Speech or Debate Clause represents " 'a textually demonstrable constitutional commitment of [an] issue to a coordinate political department' " *(supra,* at 235, n 11, quoting *Baker v Carr, supra,* 369 US, at 217), the court suggested that the clause "speaks so directly to" separation of powers principles that if the Congressman could not properly claim speech or debate immunity, he could not escape liability by claiming that the lawsuit was nonjusticiable. *(Supra,* at 235-236, n 11.) The court further noted that the action presented only the question of whether the plaintiff's constitutional rights were violated—a "determination [which] falls within the traditional role accorded courts"—and neither involved a lack of respect for the

Legislature nor required a policy decision ill-suited to judicial resolution. *(Supra,* at 236, n 11.)

Other Supreme Court decisions also demonstrate that the Speech or Debate Clause completely meets all of the separation of powers concerns implicated by a prosecution against a legislator. In *United States v Brewster* (408 US 501, *supra),* for instance, the court observed that at least one of its prior decisions stood "as a unanimous holding that a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts" insulated from examination by the clause. *(Supra,* at 512, citing *United States v Johnson, supra,* 383 US, at 184-185, 188-189; *accord, United States v Helstoski, supra,* 442 US, at 487-488; *cf., Gravel v United States, supra,* 408 US, at 626-627 [noting that a legislator is in no way privileged to escape prosecution for criminal acts which do not fall within the protections of the Speech or Debate Clause].) Notably, in *Brewster,* the court explicitly addressed the separation of powers implications of its decision, stating, "We * * * see no substantial increase in the power of the Executive and Judicial Branches over the Legislative Branch resulting from our holding today." *(Supra,* 408 US, at 524.)

The clear import of the Supreme Court's construction of the Speech or Debate Clause is that once it is decided that challenged conduct does not embrace an immunized legislative act, absent some other specific constitutional provision requiring the legislative or executive branch, rather than the judiciary, to exercise adjudicatory power with respect to the criminal acts of legislators *(see generally, Powell v McCormack,* 395 US 486, 518-548), a prosecution can proceed "without any special constitutional restraints arising from the status of the defendant." *(United States v Myers, supra,* 635 F2d, at 939; *accord, United States v Eilberg,* 507 F Supp 267, 286.) The motion court, however, held that, since some activities, even though not constituting legislative acts protected by the clause, "are legitimate to the office of a State legislator" *(supra,* 139 Misc 2d, at 927), it is appropriate to consider whether other separation of powers principles place such activities beyond the scope of judicial review.[22] Innumerable

---

22. To support this view, the court, citing *Matter of Gottlieb v Duryea* (38 AD2d 634, 635, *affd* 30 NY2d 807, *cert denied* 409 US 1008) noted that courts traditionally defer to the Legislature in the administration of its

cases have upheld the right to proceed in lawsuits and criminal prosecutions against legislators notwithstanding that the challenged conduct, while not constituting a legislative act protected by the Speech or Debate Clause, consists of activities falling within the "legitimate" sphere of a legislator's official functions. *(See, e.g., Gravel v United States, supra,* 408 US, at 625.)

Indeed, it is doubtful whether any separation of powers principle would be violated by judicial scrutiny of actions which, though undertaken in an individual legislator's official capacity, do not constitute legislative acts insulated from review under the Speech or Debate Clause, since it is the Legislature, not any one of its individual members, which constitutes a coordinate branch of government. The official activities of an individual legislator which do not constitute legislative acts are manifestations of "the views and will of a single Member" of the Legislature. *(Hutchinson v Proxmire, supra,* 443 US, at 133.) Thus, separation of powers principles are not violated when such activities, even though falling within the legislator's official functions, are subject to judicial scrutiny.

The Federal courts have steadfastly refused to create a common-law doctrine of absolute immunity which would confer upon legislators supplemental protection for conduct not insulated by the Speech or Debate Clause. *(See, e.g., Doe v McMillan, supra,* 412 US, at 324-325; *Walker v Jones, supra,* 733 F2d, at 932-933; *see also, Harlow v Fitzgerald,* 457 US 800, 810-811.) This reluctance to expand legislative immunity is as much a function of separation of powers concerns as it is a statement of judicial policy.

Indeed, in *Chastain v Sundquist* (833 F2d 311, *supra),* for example, which involved a common-law defamation suit arising from a letter sent by a Congressman, in the course of his official responsibilities, to the Attorney General and to the press, the court rejected a claim of immunity both under the Speech or Debate Clause and by virtue of the Congressman's having defamed the plaintiff in the course of his official

internal affairs. In *Gottlieb,* the court refused to intervene in a dispute between two members of the Assembly over the use of franking privileges, an activity which has been held not to constitute a legislative act protected by the Speech or Debate Clause. The *Gottlieb* decision is plainly inapposite, since it involved a "purely internal" dispute between legislators, and did not present a significant question of law. *(See, Matter of Anderson v Krupsak,* 40 NY2d 397, 403.)

legislative duties. The court noted, *inter alia,* that the Speech or Debate Clause was designed to promote "good government" by immunizing legislators for their legislative acts but leaving them accountable for all other activities. *(Supra,* at 324-325.) It therefore reasoned that a decision to expand the protections afforded to legislators would frustrate the intentions of the framers of the Constitution by defeating the careful balance deliberately struck in the Speech or Debate Clause—not only to foster "the integrity of the legislative process" but to prevent " ' "the abuses that could flow from too sweeping safeguards." ' " *(Supra,* at 325, quoting *Hutchinson v Proxmire, supra,* 443 US, at 127, *and United States v Brewster, supra,* 408 US, at 517.) In rejecting the judicial creation of an immunity doctrine to supplement the Speech or Debate Clause, the court observed that it is the Legislature, not the judiciary or the executive, which is empowered to pass laws, and that Congress could, if it so desired, immunize its members from liability for tortious conduct: "[T]he possibility of self-protection, subject to judicial review, makes the judicial rush into the breach all the more appropriate. Separation of powers counsels as much against a grab of power committed to other branches as it does to extending protection to a branch that may well have the power to protect itself. If members of Congress in fact believe they require the protection of official immunity, let them so declare and stand accountable to the people for their action." *(Supra,* 833 F2d, at 327; *see, also, United States v Brewster, supra,* 408 US, at 524; *United States v Myers, supra,* 635 F2d, at 939.)

These principles are no less applicable where legislators seek to avoid criminal liability. Indeed, where, as here, a legislator seeks immunity from criminal prosecution for acts which fall outside the scope of speech or debate immunity, the separation of powers concerns outlined in *Chastain (supra)* are even more directly implicated than in cases involving civil liability since a criminal prosecution seeks to vindicate not just private interests but, rather, to hold a defendant accountable to the public-at-large. Like all defendants, a legislator has available to him certain substantive defenses and procedural protections. If, as a matter of policy, additional protections are required, that is a matter to be decided by the policy-making branches of government. *(See, e.g., United States v Myers, supra,* 635 F2d, at 939.)

Even if the motion court could have properly considered defendants' separation of powers arguments, none of the

counts of the indictment should have been dismissed on the ground that they involve nonjusticiable political questions. "Justiciability", which ensures that the judiciary does not intrude upon or usurp the powers constitutionally allocated to the executive or the Legislature, holds that Judges should decide only "judicially manageable questions". *(Jones v Beame,* 45 NY2d 402, 408; *see, e.g., Saxton v Carey,* 44 NY2d 545, 551.) "It is a fundamental principle of the organic law that each department should be free from interference, in the discharge of its peculiar duties, by either of the others." *(People ex rel. Burby v Howland,* 155 NY 270, 282; *Matter of Nicholas v Kahn,* 47 NY2d 24, 31 [no branch of government may "arrogate unto itself the powers residing wholly in another branch"]; *see also, Rapp v Carey,* 44 NY2d 157, 167.) The dismissed counts are clearly justiciable since they do not involve matters which interfere with legitimate legislative prerogatives and implicate only legal and factual issues plainly suited to judicial resolution.

Although the concept of justiciability has never been precisely defined, its principles are found in those cases holding that courts should not render advisory opinions, entertain disputes in which the litigants lack standing, decide lawsuits which have become moot, resolve "political questions", intrude into the internal affairs of a coordinate branch of government, or become embroiled in policy matters constitutionally delegated to, or more suited to resolution by, the executive or the Legislature. *(See, e.g., Matter of New York State Inspection, Sec. & Law Enforcement Employees v Cuomo,* 64 NY2d 233, 239-240; *Klostermann v Cuomo,* 61 NY2d 525, 535-536; *Heimbach v State of New York,* 59 NY2d 891, 893, *appeal dismissed* 464 US 956.)

Merely because a case may have political overtones, involve public policy, or implicate some seemingly internal affairs of the executive or legislative branches does not, however, render the matter nonjusticiable. Courts still have the responsibility to decide questions of law, even if the particular case also involves a political issue or legislative matter. *(See, e.g., Matter of Board of Educ. v City of New York,* 41 NY2d 535, 538; *Matter of Anderson v Krupsak,* 40 NY2d 397, 403; *see also, Board of Educ. v Nyquist,* 57 NY2d 27, 39, *appeal dismissed* 459 US 1138; *cf., Heimbach v Chu,* 744 F2d 11, 14, *cert denied* 470 US 1084.) "To do otherwise would only undermine the function of the judiciary as a coequal branch of government." *(Matter of Anderson v Krupsak, supra,* at 404.)

In *Baker v Carr* (369 US 186, *supra*), the Supreme Court set forth several indicia for determining whether a particular dispute is nonjusticiable because it involves a political question, noting that dismissal is appropriate only if "one of these formulations is inextricable from the case at bar": "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *(Supra,* at 217; *see also, Powell v McCormack, supra,* 395 US, at 518-519.)

In denying defendants' motion to dismiss the counts of the indictment relating to the "no-show" employees and most of the "Category 3" or "campaign only" workers, the court properly rejected their attempt to invoke several of these factors. It concluded that although there is a sufficiently discoverable and manageable standard set forth in article VII, § 8 of the NY Constitution—"The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private undertaking"—for determining whether defendants violated the law by paying individuals with State money to engage in full-time campaign work,[23] the constitutional proscription against using public funds for private purposes could not be "so categorically applied" as to permit defendants' prosecution with respect to employees who had engaged in full-time political work during the campaign but had performed some services of value to the Legislature at other times. As to these employees, the court found that the wide degree of discretion accorded to defendants with respect to the terms of staff members' employment rendered the prosecution nonjusticiable because it would impermissibly

**23.** Numerous cases illustrate that article VII, § 8 "forbids the legislature * * * to make gifts or gratuities, or to loan [public] money or * * * credit for the benefit of individuals". *(Matter of Borup,* 182 NY 222, 226; *see, e.g., Cuvillier v State of New York,* 250 NY 258, 260-261; *Farrington v State of New York,* 248 NY 112, 115; *Fox v Mohawk & Hudson Riv. Humane Socy.,* 165 NY 517, 523-524.)

intrude upon the internal administration and prerogatives of the Legislature.

To support this view, the court observed that various provisions of the Legislative Law grant Senators, and Ohrenstein in particular, a great degree of discretion in assigning staff members to perform legislative responsibilities, setting their salaries, and deciding such routine matters as hours of employment and vacation time. Thus, the court found, compensating employees for their campaign work during the 1986 campaign could constitute a legitimate payment for legislative work performed prior to, or in anticipation of, the period expressly set forth in the certification. Since the courts have not explicitly been granted statutory authority to review the exercise of such discretionary decisions, the court reasoned, the execution of a payroll certification with respect to an employee who had, at some time, performed legislative work would present a justiciable controversy only if it involved a "patent" violation of the Constitution. Finding that the constitutional violation allegedly committed in this case was not sufficiently "patent", the court concluded that the counts pertaining to these employees would require a nonjusticiable examination into the "internal administration" of defendants' legislative staff. It therefore dismissed these counts.

This conclusion was also erroneous. To the extent that the court interpreted the indictment as challenging defendants' discretionary decisions with respect to the terms of employment of staff members, it has misconstrued the nature of the charges. Contrary to the court's view, the charges in the indictment do not question the propriety of paying employees for past services rendered or future services contemplated. The indictment charges that staff members were paid not for past or future legislative work, but, rather, solely for their campaign work; some for the entire time they were on the State payroll, and others for significant periods of time when no legislative work was done or contemplated. Thus, the prosecution is based, not on the theory that the executive or judiciary can dictate the discretionary terms of employment of legislative staffs, but upon the premise that it is not within a legislator's discretion to pay for private campaign services with public funds.

That issue is plainly justiciable under controlling precedent. While separation of powers principles dictate that courts must accord due respect to the Legislature by exercising restraint whenever a litigant seeks judicial review of "wholly internal"

legislative affairs or prerogatives *(see, e.g., Heimbach v State of New York, supra,* 59 NY2d, at 893; *Matter of Gottlieb v Duryea,* 38 AD2d 634, 635), a legislator's mere assertion that he has discretion to spend public funds does not render a use of those funds for private purposes a "wholly internal" prerogative. That defendants may have discretion to pay legislative employees for past work cannot, of itself, justify the motion court's conclusion that the counts in question are not justiciable.

The Court of Appeals has repeatedly held that the judiciary not only may, but must, decide whether purportedly "internal" legislative procedures comply with State statutes and constitutional provisions. *(See, e.g., Matter of Board of Educ. v City of New York,* 41 NY2d 535, 538; *Board of Educ. v Nyquist, supra,* 57 NY2d, at 39; *cf., Heimbach v Chu, supra,* 744 F2d, at 14.)* In fact, it has held that the mere involvement of some political "questions", "overtones" or "connotations" does not, in a case presenting issues of law, transform the case into a "wholly internal" affair of the Legislature. *(See, Matter of Anderson v Krupsak, supra,* 40 NY2d, at 403-404.)

The counts in question raise several significant questions of law which place this case well beyond the pale of purely internal legislative affairs. At the very minimum, the indictment poses the constitutional question of whether legislative employees can be compensated from public funds in exchange for the rendition of services to individual candidates. In that regard, there is no authority suggesting that a showing of "patent" unconstitutionality is a prerequisite to judicial review of a purportedly nonjusticiable issue. Rather, the standard governing the justiciability of a dispute arising from purportedly "internal" legislative affairs is merely whether a question of law is presented. *(See, e.g., Board of Educ. v Nyquist, supra,* 57 NY2d, at 39; *Matter of Anderson v Krupsak, supra,* 40 NY2d, at 402-404; *New York Pub. Interest Research Group v Steingut, supra,* 40 NY2d, at 257-260.)

In fact, the Court of Appeals has held that such disputes involve justiciable controversies, notwithstanding that the issues involved either arcane questions of constitutional law hardly evincing "patent" illegality *(see, e.g., Matter of Board of Educ. v City of New York, supra,* 41 NY2d, at 538-544; *New York Pub. Interest Research Group v Steingut, supra,* 40 NY2d, at 257-260), or matters of statutory interpretation which did not even implicate unconstitutional conduct *(see, e.g., Matter of Anderson v Krupsak, supra,* 40 NY2d, at 402-404). Signifi-

cantly, the Court of Appeals has, in several cases, found a justiciable issue present notwithstanding that, upon reaching the merits, it concluded that neither the Constitution nor any statute had been violated. *(See, e.g., Board of Educ. v Nyquist, supra,* 57 NY2d, at 39; *Matter of Anderson v Krupsak, supra,* at 402-404.)* Whether a case presents a justiciable controversy is, of course, a threshold procedural issue which generally does not require an examination of the merits of the dispute and is usually decided by reference to the pleadings. *(See, e.g., Klostermann v Cuomo, supra,* 61 NY2d, at 535; *cf., Jones v Beame, supra,* 45 NY2d, at 406 [accepting plaintiffs' allegations of fact as true for purposes of deciding a motion to dismiss on justiciability grounds].)

Nor does the State Constitution *(see,* art VII, § 8) suggest that only "patent" gifts of public funds to private individuals give rise to questions of law. Indeed, whether a legislative expenditure is an unconstitutional gift of public funds masquerading as a legitimate appropriation always gives rise to "a question of legislative power which must be determined by the courts." *(Farrington v State of New York,* 248 NY 112, 115.)

Thus, neither the Constitution nor any Court of Appeals case supports the motion court's view that only "patent" constitutional violations give rise to justiciable controversies involving purportedly internal legislative affairs. To support its conclusion to the contrary, the court cited two cases from other jurisdictions *State ex rel. Overhulse v Appling* (226 Ore 575, 361 P2d 86, 92-93) and *In re Advisory Opinion to House of Representatives* (485 A2d 550, 555 [RI]), both of which suggest that the court should presume, as they do when evaluating the acts of Legislatures as a whole, that the actions of individual legislators will be performed in accordance with the provisions of the Constitution and that this presumption can be rebutted only by evidence of "patently" unconstitutional conduct. It should be noted, however, that neither of these cases involved, as here, the justiciability of a prosecution arising from allegations of past criminal acts of a legislator. Instead, in both cases, the courts were presented with a completely different question, namely, whether a statute was unconstitutional because it did not contain sufficient safeguards against the prospect of abuse by individual legislators. *(See, State ex rel. Overhulse v Appling, supra,* 361 P2d, at 92-93; *In re Advisory Opinion to House of Representatives, supra,* at 555.)

While a court may reasonably refuse to find a statute unconstitutional on the basis of nothing more than an unsubstantiated belief that those entrusted to enact the provision cannot be trusted to follow it, such reasoning has no application where legally sufficient evidence of a specific legislator's criminal conduct has already been presented. In any event, the motion court's imposition of a requirement that "patently" unconstitutional conduct must be shown before a legislator can be prosecuted would, if adopted, effectively overrule at least one Court of Appeals case which holds that legislative activities are not "wholly internal" matters beyond the scope of judicial review when they involve questions, not of constitutional law, but of statutory construction. *(See, Matter of Anderson v Krupsak, supra,* 40 NY2d, at 402-404.)

*Krupsak (supra)* involved a challenge to the Legislature's election, in a joint session, of three members of the Board of Regents on the grounds that the session had not been properly convened, that no joint resolution had been passed to govern the voting, and that a quorum had not been present. Rejecting the contention that the matter was not justiciable because it was "merely an internal administrative dispute within the Legislature which the courts should refrain from entertaining" *(supra,* at 402), the court held that the case raised "significant questions of law" concerning the statute which set forth the procedures governing the election of members to the Board. *(See, supra,* at 403.) Moreover, since the case represented a challenge to the election of the three Regents in question, it also raised "the more significant question whether these three persons legally held and exercised the powers of the important office of Regent of the University of the State of New York" *(supra,* at 403). Either consideration, the court concluded, "and certainly both when taken together," made it obvious "that this is far more than a matter of internal administration within the Legislature" *(supra,* at 403).

The Constitution specifically confers upon the Legislature the responsibility to appropriate funds and to regulate the salaries and hours of State employees. *(See,* NY Const, art VII, § 7; art XIII, § 14.)* Pursuant to that authority, Legislative Law § 6 (2) empowers the minority leader to "appoint such employees to assist him in the performance of his duties as may be authorized and provided for in the legislative appropriation bill", and allows him to place these workers "on an annual, session or temporary payroll, as [he] shall, in his sole discretion, determine" (Legislative Law § 11; *see,* §§ 8, 9, 10). In

addition, the State budget, passed by the Legislature, includes an appropriation for the "personal services" of Senate employees. Thus, Senators do possess a certain degree of discretion in hiring and paying their staff members. That, however, does not automatically transform payments made to these employees into a wholly internal affair of the Legislature. The law is clear that the judiciary has a responsibility to construe statutes which provide for the discretionary use of State and local funds, and to decide the purely legal question of whether this discretion includes a right to use the funds to advance a political cause.

*Matter of Phillips v Maurer* (67 NY2d 672), for example, involved a challenge to the propriety of a school board's use of school district funds to place an advertisement in a newspaper urging voters to vote in favor of a budget and bond issue. While noting that the board had a right under the Education Law to use public money to provide "educational and informational material to enlighten the voters" with respect to budget proposals *(see, supra,* at 673), the court concluded that the statute did not confer any authority "to disseminate information, at the taxpayers' expense, patently designed to exhort the electorate to cast their ballots in support of a particular position advocated by the board". *(Supra,* at 674.)

Thus, although there is no express statutory authority for judicial review of a legislator's discretion to pay for services rendered by his employees, the question of whether defendants have used public funds for political purposes is not a wholly internal legislative affair. What is at issue here is a justiciable question of law, namely, whether the express statutory right of Ohrenstein to hire individuals "to assist him in the performance of his duties" constitutes an implicit grant of authority to use such employees "to assist him in" promoting the political interests of individual senatorial candidates. *(See, supra,* at 673-674; *Stern v Kramarsky,* 84 Misc 2d 447, 450; *Stanson v Mott,* 17 Col 3d 206, 551 P2d 1, 6-13; *Burt v Blumenauer,* 299 Ore 55, 699 P2d 168, 179.)* Since every count of the indictment presents this question of law, none of the counts should have been dismissed on justiciability grounds.

The holding that the dismissed counts involve political questions is especially disturbing in light of the Legislature's failure anywhere to evince an intention to preclude the courts from considering the constitutional or statutory questions here presented. Nor is there any indication that the Legislature has attempted to resolve any of the constitutional or

legal issues implicated by the dismissed counts. *(See generally, Klostermann v Cuomo, supra,* 61 NY2d, at 535-536; *Jones v Beame, supra,* 45 NY2d, at 408; *Matter of New York State Inspection, Sec. & Law Enforcement Employees v Cuomo, supra,* 64 NY2d, at 239-241.)* The Legislature did, in April 1987, after the conclusion of the 1986 campaign and the investigation into it had been disclosed, pass a concurrent resolution providing that legislative employees should be "free to engage in political campaign activities" when not obligated to perform official duties. Even assuming, however, that defendants' activities could have been retroactively legitimized, the resolution nowhere addressed the legal question presented here, that is, whether it is constitutionally permissible, or within the scope of a legislator's statutory discretion, to pay legislative employees from State funds for engaging in campaign work. Thus, the 1987 resolution does not, in any way, alter the conclusion that the dismissed counts involve legal issues subject to review rather than a nonjusticiable political question.

Nor does the 1945 legislative report cited by the motion court and relied upon by the majority change that conclusion. As the motion court noted, the report describes the hours of legislative employees as irregular, states that their titles do not necessarily conform to their duties, and observes that legislators must have flexibility in staffing. *(See,* Interim Report of NY St Joint Legis Comm on Legis Methods, Practices, Procedures and Expenditures, 1945 NY Legis Doc No. 35, at 36-38.)* The report does not suggest, however, that legislators have such unfettered discretion that they are permitted to sign payroll certifications without regard to the actual duties performed by an employee or to permit personnel to be paid for nonlegislative work.

To the extent that the report is relevant at all, it demonstrates that the dismissed counts presented, at the very least, a question of law concerning the scope of discretion accorded to legislators under the Legislative Law. Indeed, as the report makes clear, payroll certifications are not trivial documents without legal significance, but, rather, instruments designed to ensure that public funds are being used to compensate legislative employees only for public duties actually performed.

Since neither the 1945 report nor the legislative resolution reflects any effort by the Legislature to address, much less resolve, the issue of whether a legislator has statutory discretion or constitutional authority to pay public employees from

the treasury in exchange for private campaign duties, there is no reason to conclude that the dismissed counts involve matters ill-suited for judicial scrutiny. Thus, this is not like the case of *United States ex rel. Joseph v Cannon* (642 F2d 1373, 1380, *cert denied* 455 US 999), for example, upon which the majority relies, which the court dismissed on, *inter alia*, nonjusticiability grounds. *Cannon* was an action under the Federal False Claims Act against a United States Senator and his administrative assistant charging that the Senator had authorized payment of the assistant's salary during a period in which the assistant was working exclusively on the Senator's reelection campaign.

In concluding that "we are left with the perplexing question whether campaign work is official activity", an issue upon which not even the Senate could "reach a consensus" *(supra, 642 F2d, at 1380)*, the *Cannon* court found "a complete absence 'of judicially discoverable and manageable standards for resolving' the question whether Senators may use paid staff members in their campaign activities." *(Supra, at 1379.)* The court traced the history of the Senate's attempt to develop a suitable rule. It observed that at the time the Senator began his reelection campaign the Senate's sole rule governing the participation of staff members in campaign activities permitted only employees designated by a Senator "to receive, solicit, hold, or distribute campaign funds" *(supra, at 1380)*. The court found it significant that, in recommending the rule's promulgation, a Senate committee had expressly "disavowed any intention to deter campaign activity by Senate employees beyond involvement with campaign monies" *(supra, at 1380)*. The court also noted that the floor debate on the rule essentially reaffirmed the view "that a Senator's staff was generally free to assist in his reelection efforts" *(supra, at 1380)*. Finally, the court examined the Senate's attempt, subsequent to the campaign, to consider the role of a legislator's staff in campaigns. No definitive rule, however, was ever enacted. Thus, the court held, since the Senate itself could not resolve the issue notwithstanding that it was not only authorized, but "institutionally equipped", to frame public policy and develop its own rules, the issue was not suited to judicial resolution. *(Supra, at 1384.)*

Clearly, *Cannon (supra)* does not demonstrate that the charges encompassed by this indictment involve nonjusticiable issues. *Cannon* was premised on the lack of standards under Federal law by which a court could determine whether con-

gressional employees could be paid for engaging in campaign activity. In contrast, there are ample standards under New York law by which a court can determine whether State funds may be used by a legislator to finance a political campaign. As already noted, the New York State Constitution (art VII, § 8) prohibits the Legislature from making gifts of public funds to support private undertakings. In addition, quite apart from the constitutional prohibition, since defendants claim that their conduct was authorized by the Legislative Law and legislative appropriation, courts are fully entitled to construe these enactments, determine the scope of authority they confer and decide whether any power thus conferred violates constitutional standards. *(See,* Legislative Law § 6 [2]; *Matter of Anderson v Krupsak, supra,* 40 NY2d, at 402-404.) Moreover, unlike *Cannon,* this court has available to it several cases which demonstrate the impermissibility in New York of using public money to further political causes. *(See, e.g., Matter of Phillips v Maurer, supra,* 67 NY2d, at 673-674; *Stern v Kramarsky, supra,* 84 Misc 2d, at 452.)

*Cannon (supra)* is distinguishable, in any event, since this case does not involve the issue of whether a court may impose civil liability upon a legislator based upon a single staff member's participation in campaign activities. Rather, this case involves an issue expressly left open in *Cannon,* i.e., whether legislators "may defraud the Government without subjecting themselves to statutory liabilities." *(Supra,* at 1385.) Moreover, unlike *Cannon,* this case does not involve the activities of a lone legislative employee engaging in political activities for the particular legislator for whom he works while on the State payroll; rather, it presents a situation in which a contingent of public workers was dispatched across the State, not to aid in the reelection efforts of the Senators for whom they worked, but to work full time for other candidates.

*Cannon (supra)* is inapposite for yet another, even more significant, reason. The New York Legislature, unlike the United States Senate in *Cannon,* had not, before the 1986 election, struggled with the issues involved here. While it is a fact, as defendants note, that the Legislature never passed any law or resolution, one way or the other, before 1986, as to whether it was permissible for individual legislators to use their staff to support the campaigns of political allies, its failure to do so is far more consistent with the conclusion that

such conduct was regarded as illegal, than it is with the view that the question was too difficult a policy question to resolve. *(Cf., Fair Political Practices Commn. v Suitt,* 90 Cal App 3d 125, 131-132, 153 Cal Rptr 311, 315.) The New York Legislature's silence is a far cry from the judicial legislative activity found so persuasive in *Cannon*—the promulgation of a rule allowing designated employees to solicit or handle campaign funds, which rule was never intended to limit the participation of other staff members in campaigns.

The only rational distinction that can be drawn between the counts dismissed by the motion court on justiciability grounds and those allowed to stand is that the dismissed counts require a determination as to whether the employees in question were compensated from public funds for private campaign services in addition to any legislative duties they may have performed, while the remaining counts involve the much simpler factual issue of whether the affected employees were paid without performing any legislative work during the relevant periods. Such distinction does not, however, support the conclusion that the dismissed counts involve a nonjusticiable political question. The question of whether these payments did, in fact, constitute earnings for past or future services to the Legislature rather than compensation for full-time campaign duties is an objective issue of fact of the kind that courts and juries routinely consider. *(See generally, United States v Duggan,* 743 F2d 59, 74; *cf., United States v Nixon,* 418 US 683, 696-697.)

For example, in *United States v Diggs* (613 F2d 988, *cert denied* 446 US 982), a Congressman's conviction of mail fraud and making false statements in payroll authorizations for congressional employees who rendered services to one of his private enterprises, was affirmed, notwithstanding that the defendant claimed "that he acted within the bounds of his discretion to set the duties and salaries of his congressional employees" *(supra,* at 991). The court rejected the defendant's argument that since the employees in question performed some official responsibilities it was within his discretion to set the employees' salaries and assign them duties *(see, supra,* at 1002), concluding, "There was sufficient evidence from which the jury could conclude that the defendant in fact placed [the employees] on the payroll with the intention of compensating them for services rendered to the [defendant's enterprise] or

the defendant.[24] *(Supra,* at 1002; *see also, Shakman v Democratic Org.,* 435 F2d 267, *cert denied* 402 US 909.)

While there may be a case in which the duties of a public employee are so intertwined with legitimate functions as to make it difficult to decide, as a question of fact, whether the employee has been paid from public funds in exchange for the rendition of private services,[25] this is not such a case, since most of the employees in question did not perform any legislative duties at all during the period covered by the indictment. Moreover, although two of them may have performed some isolated services for the Legislature during the course of the campaign, whether the testimony pertaining to those services is credible is itself a question of fact. Even if such testimony were found to be accurate and credible, it is hardly demonstrative of such an extensive involvement in legislative work as to render it impossible, or even particularly difficult, to ascertain the degree to which these employees were being compensated from public funds for their campaign work.[26] Furthermore, the suggestion by the motion court that defendants may have intended to pay for past legislative work through the payroll certifications covered by the dismissed counts finds no support in the record. Indeed, there is every

---

**24.** In *United States v Diggs,* the Congressman also was charged with inflating the salaries of his congressional employees to the extent that they paid some of his personal and district office expenses. (613 F2d 988, 995.) The court rejected the defendant's claim that this was a permissible exercise of his discretion, noting that "[such] argument erroneously equates a congressman's discretion to define the duties of an employee with the unfettered power to divert monies intended for one purpose to another, completely unauthorized purpose." *(Supra,* at 995.)

**25.** For example, in *Winpisinger v Watson* (628 F2d 133, *cert denied* 446 US 929), the court refused to entertain a civil suit charging that members of President Carter's administration were illegally using public funds to promote the President's reelection. Although basing its decision on standing grounds rather than a political question analysis, the court noted that "[a] fair characterization of the accusations would necessarily include the observation that they relate, quite literally, to virtually every discretionary decision made by the Administration acting through these high government officials." *(Supra,* at 139.)

**26.** Of course, defendants may attempt to show that the employees in question were, in fact, paid only for rendering past services to the Legislature and that defendants so intended when the payroll certifications were submitted. The mere prospect that the defendants may submit proof of this kind does not, however, render the prosecution nonjusticiable any more than a legislator's right to introduce evidence of a legislative act in his own defense would render him immune under the Speech or Debate Clause.

indication that these salary payments were intended to compensate employees solely for performing campaign work.

For instance, Senator Ohrenstein considered campaign work as part of the duties of his staff members. Moreover, the Grand Jury evidence shows that most of the employees in question performed these assignments, without discharging any legislative duties, from June 1986 through the November election. Finally, as the motion court itself recognized, staff members who performed their assigned campaign duties "customarily" were "given the month off after the election". In such circumstances, it cannot be seriously suggested that defendants believed that the nearly six months of full-time campaign duties to which staff members were assigned was nothing more than uncompensated volunteer work and that the paychecks received during this period represented compensation not for campaign work but for services rendered to the Legislature during the six months prior to the onset of the campaign.

The decision to permit defendants to escape prosecution on the dismissed counts would frustrate the very separation of powers principles that the justiciability doctrine seeks to foster. The judiciary's refusal to intervene in certain legislative affairs is premised on its respect for the constitutionally delegated authority of the Legislature and a reluctance to intrude on its functions and prerogatives. *(See, e.g., Heimbach v State of New York, supra,* 59 NY2d, at 893; *Matter of Nicholas v Kahn, supra,* 47 NY2d, at 31.) That doctrine, in turn, emanates from a recognition that the Constitution apportions power among the three coordinate branches of government to forestall the "excessive concentration of power in any one branch or in any one person." *(Rapp v Carey, supra,* 44 NY2d, at 162.)

The motion court's decision—significantly expanded upon by the majority—to dismiss certain counts of the indictment on justiciability grounds, however, frustrates that goal since the dismissal of these counts presents a more direct threat to separation of powers principles than does permitting them to go . forward.[27] The court's decision allows an unprecedented arrogation of power by legislators at the expense of both the

---

**27.** *Cf., United States v Hastings,* 681 F2d 706, 711, *cert denied* 459 US 1203 (holding that sitting Federal Judges are not entitled to absolute immunity from criminal prosecution, on separation of powers grounds, because "the miniscule increment in judicial independence that might be derived * * * would be outweighed by the tremendous harm that the rule

executive and judicial branches. In fact, it provides a safe haven through which a legislator can place beyond challenge a blatantly illegal use of public funds for private political purposes.

The majority's determination that the acts charged in this indictment (except those with respect to the "no-show" employees) involve matters which are nonjusticiable is grounded on three considerations, none of which has merit. The majority holds that since the State Constitution textually commits the issue of budget enactment and regulation of wages and hours of State employees to the Legislature, the payment and deployment of legislative employees involves the internal procedures and functions of the Legislature, which "should be free from interference from another branch of government." The majority also concludes that since politics is an integral part of the legislative process and legislators must necessarily engage in political activities "to garner public support" for their legislative programs, a legislator's use of his staff for such purposes is beyond the pale of judicial scrutiny. Finally, the majority relies upon the absence of any legislative standards, rules or guidelines defining the "proper duties" of legislative employees. It holds that, in the absence of such standards, the judiciary is ill-suited to determine the proper scope of a legislative employee's duties.

Contrary to the majority's reasoning, defendants—the Minority Leader, his chief of staff, a State Senator and a former State Senator—may not assert a constitutional interest which is not theirs to assert. Nor, in any event, do the indictment's charges in any way interfere with legitimate legislative prerogatives.

Defendants are essentially seeking to assert the Legislature's interest, as a whole, in preventing the executive or judiciary from intruding into the internal affairs of a coordinate breach of government. *(See, e.g., Matter of Nicholas v Kahn, supra,* 47 NY2d, at 31; *Saxton v Carey, supra,* 44 NY2d, at 549.)* As individual legislators, or a former legislator or an aide, as the case may be, they do not constitute a coordinate branch of government and cannot exercise the powers or assert the interests of one. The Constitution of the State of New York provides, "[t]he legislative power of this State [is] vested in the Senate and Assembly." (NY Const, art III, § 1.)

---

would cause to another treasured value of our constitutional system: no man in this country is so high that he is above the law").

Nowhere is an individual legislator given the right to exercise such power unilaterally. The Legislature cannot act except by quorum. *(See,* art III, § 23.) Nor can it imbue an individual member's acts with the status of legislative enactment; the Legislature, it is well settled, cannot delegate its legislative power to individual legislators. *(See, e.g., People v Tremaine,* 252 NY 27, 44; *New York Pub. Interest Research Group v Carey,* 86 Misc 2d 329, 331-332, *affd* 55 AD2d 274, *appeal dismissed* 41 NY2d 1072.) Thus, since it is only the Legislature that has a constitutional right to exercise legislative power, it is only the Legislature, and not defendants, that has a valid constitutional interest in defending against incursions upon that power by the other two coordinate branches of government. It is axiomatic that a defendant in a criminal proceeding cannot avoid prosecution by claiming constitutional rights and interests that are not his. *(See, e.g., Ulster County Ct. v Allen,* 442 US 140, 155; *People v Hollman,* 68 NY2d 202, 208.)

Nor have defendants advanced any valid reason to depart from this rule. They have not, for instance, demonstrated that their interests are so closely intertwined with those of the Legislature that a failure to permit them to assert these interests would adversely affect the Legislature's ability to preserve its constitutional powers. *(See, e.g., Griswold v Connecticut,* 381 US 479, 481.) Nor can they make such a showing. Their interests are not interchangeable with those of the Legislature. And, it should be noted, the indictment does not suggest, much less dictate, how the Legislature should appropriate funds, spend the funds appropriated to it or assign legislative employees. In essence, the indictment charges that defendants used public funds and deployed legislative employees in a manner completely unauthorized by the Legislature and the Constitution. Separation of powers principles cannot preclude the judiciary from inquiring into whether defendants were authorized to use public funds and employees for political purposes. Any contrary rule would permit individual legislators to usurp legislative prerogatives and thus assert the very same prerogatives as a shield against any challenges by the executive or judicial branch. There is no provision of the Constitution or any separation of powers principle which requires such an absurd result.

In fact, as already noted, separation of powers principles preclude the courts from looking beyond the Speech or Debate Clause in considering the extent to which a prosecution in-

trudes upon an individual legislator's right to exercise his or her powers. Although the clause speaks only of speech and debate, it has been construed to reach each and every constitutionally significant power that individual legislators possess. *(See, e.g., United States v Helstoski, supra,* 442 US, at 488-490; *Eastland v United States Servicemen's Fund, supra,* 421 US, at 504-505.)* Since as already noted, the Speech or Debate Clause "speaks so directly to" any separation of powers concerns that may arise from a judicial challenge to any official act of a legislator, there is no justification for permitting individual legislators to claim entitlement to immunity beyond that conferred by the clause. *(Davis v Passman, supra,* 442 US, at 235-236, n 11.)

Even if defendants could assert the constitutional interests of the Legislature in enforcing separation of powers principles, they are not entitled to a dismissal because the indictment's charges do not interfere with or usurp any legitimate legislative prerogatives. Defendants' arguments to the contrary rest upon the notion that, by exercising their right to hire staff members, they had the right to use the State payroll as a campaign war chest for the benefit of their political allies. Since, as already noted, the use of State funds for such purpose is patently unconstitutional and nowhere authorized by statute, defendants cannot claim that the Legislature intended them to possess this authority. Nor, even if legislatively authorized, would such actions lie beyond the scope of judicial review since they involve "significant questions of law" regarding constitutional principles or issues of statutory construction. *(See, Matter of Anderson v Krupsak, supra,* 40 NY2d, at 403.)* The indictment charges that defendants' use of State funds was wholly unauthorized, a matter necessarily embodying a significant question of law, which the courts are legally equipped to resolve. It should be noted that the indictment does not, in any respect, charge that defendants acted unwisely or abused their discretion in spending public money.

The notion that a legislator could use public employees solely for his own political purposes under the guise of having them assist in the performance of his official functions is totally foreign to the principles upon which our government is based. Our constitutional system was specifically designed to prevent such an "excessive concentration of power in any one branch [of government] or in any one person." *(Rapp v Carey, supra,* 44 NY2d, at 162.)* Indeed, to countenance such a concentration of power would assure the primacy of the two

political parties which are able to control the expenditure of public funds. While it is true, as the majority notes, that politics is an integral part of the legislative process, once the boundary of permissible use of public funds is transgressed, the courts have not hesitated to proscribe the expenditure notwithstanding that it was otherwise, in large part, for a permissible use. (See, Matter of Phillips v Maurer, supra, 67 NY2d, at 674.)

With respect to the majority's reliance on the absence of any affirmative legislative standards defining the scope of duties that legislative employees may properly be assigned to perform, the failure to create such a statutory or regulatory scheme does not render this prosecution nonjusticiable. In determining whether a controversy is justiciable, New York courts look, not to whether the Legislature has provided guidelines, but, rather, as already noted, to whether the controversy presents "judicially manageable" issues or questions of law. (See, e.g., Jones v Beame, supra, 45 NY2d, at 408; Saxton v Carey, supra, 44 NY2d, at 551.) Since the Court of Appeals has expressly held that disputes involving genuine questions of law are justiciable notwithstanding that they may also have political overtones (see, e.g., Matter of Korn v Gulotta, 72 NY2d 363; Matter of Anderson v Krupsak, supra, 40 NY2d, at 403-404), that defendants are legislators or former legislators or aides does not mean that the judiciary is incapable of resolving the issues presented by this indictment. Moreover, as has been amply demonstrated, judicially manageable standards do exist to judge defendants' conduct.

Since this prosecution does not violate separation of powers principles and defendants' conduct in filing payroll certifications and using State funds to pay "no-show" or "campaign only" workers does not constitute a legislative act immune from judicial scrutiny under the Speech or Debate Clause, defendants are not entitled to any relief on those grounds in their article 78 proceeding. The only other asserted grounds in support of their petition are a due process claim, the argument that several counts of the indictment are multiplicious, and, finally, the claim that the motion court usurped the function of the Grand Jury by rewriting the conspiracy charge in response to its dismissal of certain counts.

In support of their due process claim defendants argue—and the majority holds—that, because the Penal Law does not specifically condemn their conduct, they were denied fair notice that it was prohibited. As a threshold matter, such

claim is not cognizable in an article 78 proceeding. As the Court of Appeals has repeatedly held, prohibition is available only where there is a clear legal right and only when a court acts or threatens to act either in excess of its jurisdiction or in excess of its authorized powers in a proceeding over which it has jurisdiction. *(Matter of Holtzman v Goldman,* 71 NY2d 564, 569.) Moreover, errors properly redressable on direct appeal should not be collaterally reviewed by writ of prohibition. *(Matter of Maisonet v Merola,* 69 NY2d 965.) Similarly, article 78 relief in the nature of mandamus will not lie where the application is for "interlocutory relief which operates to disrupt the normal progress of a pending criminal action." *(Matter of Legal Aid Socy. v Scheinman,* 53 NY2d 12, 16.) Like prohibition, mandamus is not available to remedy or prevent mere trial errors, particularly where the error is cognizable on direct appeal. *(Matter of Veloz v Rothwax,* 65 NY2d 902, 904.)

What is cognizable in an article 78 proceeding are those claims that challenge the legality of the proceeding itself. Thus, while article 78 relief will not lie to challenge the constitutionality of a statute as applied *(Matter of Rossi v County Ct.,* 31 AD2d 715, 716), it will lie to challenge a prosecution under a facially invalid statute. *(See, Matter of Fenster v Criminal Ct.,* 46 Misc 2d 179, 180, *appeal dismissed* 16 NY2d 612.)* Since defendants' due process claim challenges the application of a variety of Penal Law sections, it may not be raised in an article 78 proceeding. Moreover, as defendants will have the opportunity to take a direct appeal in the event of a conviction, they are not entitled to collateral review now. *(See, Matter of Maisonet v Merola, supra,* 69 NY2d, at 966.) Finally, a declaratory judgment attacking an interlocutory ruling in a criminal action will not lie when its determination requires application of a statute to disputed facts *(Matter of Morgenthau v Erlbaum,* 59 NY2d 143, 150-151); nor will it lie when agreed upon facts are subject to different interpretations *(New York Foreign Trade Zones Operators v State Liq. Auth.,* 285 NY 272, 276, 278).

As to the merits, due process requires that a penal statute be stated in terms so that a person of ordinary intelligence will know what the law prohibits or commands. *(United States v Petrillo,* 332 US 1, 6; *see also, People v Cruz,* 48 NY2d 419, 423-424.) To meet this requirement, a statute must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" *(United States v Harriss,* 347 US 612, 617), and "provide explicit standards for

those who apply them" so as to avoid arbitrary enforcement *(Grayned v City of Rockford,* 408 US 104, 108-109; *see also, People v Smith,* 44 NY2d 613, 618).

Since it is virtually impossible for legislation to specify every act or possibility it addresses, the Constitution, rather than impose "impossible standards", requires only reasonable precision. *(United States v Petrillo, supra,* 332 US, at 7-8; *People v Cruz, supra,* 48 NY2d, at 424; *see also, Grayned v City of Rockford, supra,* 408 US, at 110.) As long as "the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague, even though marginal cases could be put where doubts might arise." *(United States v Harriss, supra,* 347 US, at 618.) "[M]ost statutes must deal with untold and unforeseen varia- tions in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." *(Boyce Motor Lines v United States,* 342 US 337, 340.)

Thus, it is defendants' burden to show that the penal statutes involved, as applied to their conduct, are so "vague and uncertain" that they could not determine if their conduct was illegal. *(United States v Irwin,* 354 F2d 192, 196, *cert denied* 383 US 967; *see also, United States v Tana,* 618 F Supp 1393; *State of New York v Rutkowski,* 44 NY2d 989, 991.) Needless to say, a statute is presumptively valid and can only be tested in the context of the facts of each individual case. *(See, e.g., United States v National Dairy Corp.,* 372 US 29; *United States v Tana, supra.)*

In the instant matter a person of "ordinary intelligence" would certainly know that taking State money by falsely certifying that it was to be used for a State purpose violates the law. Moreover, as the motion court noted, both the Penal Law and the Constitution provide more than adequate stan- dards to avoid arbitrary enforcement. Nor have defendants met their burden of showing that the Penal Law, as applied in this case, is so vague that they could not determine whether their conduct was illegal.

Defendants argue that for the penal statutes to encompass their conduct the courts would have to render a "pioneering interpretation" of those laws, as well as a "novel interpreta- tion" of article VII, § 8 of the NY Constitution. As the motion court found, article VII, § 8 clearly provides standards rele- vant to the expenditure of State funds for private purposes. It

correctly concluded, "A legislator * * * must be charged with knowing that partisan campaign activity valuable for no other purpose than the election of a political candidate is not governmental, much less legislative, work."

Nor is there any ambiguity in the statutes involved. For instance, section 155.00 of the Penal Law contains the definitions for the entire larceny article. "Property" explicitly includes money, which is the property alleged to have been wrongfully taken. "Owner" has been construed by the courts to include the State. (See, People v Lyon, 82 AD2d 516.) The larcenous intent required is an intent to "deprive" or "appropriate", which means to exert permanent or virtually permanent control over the property taken or to cause permanent or virtually permanent loss of property to the owner.

Here, defendants are charged with intending permanently to deprive the State of money by causing individuals to be placed on the State payroll in order to do campaign work or no work at all. Once those salaries were paid, the State lost the funds, for which it derived no benefit. Indeed, the courts of this State have found that similar schemes were properly prosecuted as larcenies. (See, e.g., People v Riccio, 91 AD2d 693, 694 [the defendant placed individual on public payroll "not in anticipation" of her performing any work]; People v Hochberg, 87 Misc 2d 1024, 1030-1031, later appeal 62 AD2d 239 [the defendant offered public employment to political rival to induce him to forego run in primary election].)

Nor can it be seriously contended that section 175.35 of the Penal Law, which prohibits offering a false instrument for filing, is unconstitutionally vague. There is an ample body of prior judicial interpretation to resolve any doubt as to the meaning of "instrument". (See, e.g., United States v Chiarella, 588 F2d 1358, 1369, revd on other grounds 445 US 222; United States v Persky, 520 F2d 283, 288.) Payroll certifications clearly fall within the scope of the statute. (See, e.g., People v Bel Air Equip. Corp., 39 NY2d 48 [State vouchers for reimbursement of expenses are instruments within the meaning of the statute]; People v Lacay, 115 AD2d 450 [sales tax return is an instrument within the meaning of the section].) The certifications involved were filed with a "public office", i.e., the State Senate. Insofar as these certifications stated that the individuals involved worked for defendants Ohrenstein, Babbush, or

one of the legislative commissions, they contained false information intended to defraud the State.[28]

*United States v Critzer* (498 F2d 1160), upon which defendants rely, is decidedly different. *Critzer* involved a series of genuinely conflicting and vague statutes which placed certain land in trust for American Indians. The defendant had been convicted of evading Federal income taxes by failing to report rental income from such trust property even though she had been advised by the Bureau of Indian Affairs that such income was not taxable. In reversing the conviction, the court noted that "the government is in dispute within itself as to whether the omitted income was taxable." *(Supra,* at 1160.) In contrast, defendants did not seek any authoritative advice before embarking on their scheme.[29] Thus, not even they thought that a governmental agency would have condoned the falsification of payroll certifications.

In further support of their claim that they could not have known their conduct was illegal, defendants, as well as the majority, also cite the refusal of the District Attorney in Kings County to prosecute Congressman Charles Schumer, and the April 9, 1987 concurrent resolution of the Senate and Assembly. The facts underlying the prosecutor's decision in the Schumer matter are also different from those in this case. That investigation involved employees who were legitimately on the State payroll and performed legitimate legislative functions, but also performed campaign work. Here, of course, employees were fraudulently placed or kept on the State payroll while not doing any work or only campaign work. The April 1987 resolution adopted internal rules barring "no-show" and "campaign only" jobs, stating that legislative employees "are compensated from the funds of the New York State Treasury for the performance of official duties on behalf of [a] member, officer, legislative commission or committee." The concurrent resolution, acknowledging that there previously had been no such guidelines, also asserts the Legisla-

---

28. There is, similarly, no vagueness problem with Penal Law § 175.35, under which defendants are charged with defrauding the government.

29. What advice defendants did receive, they chose not to follow. Although they did not seek an opinion from the government agencies charged with enforcing the law, as in *United States v Critzer* (498 F2d 1160), they did seek advice from their legislative counsel, who, in fact, advised them that they should not hire individuals solely for campaign work. That they did so nonetheless clearly demonstrates that they knew their conduct violated the law. And, as previously noted, their knowledge is further manifested by the falsity of the payroll certifications.

ture's "exclusive prerogative" to provide guidelines with respect to the participation of staff members in political campaigns. Considering that the investigation which resulted in defendants' indictment was one of the motivating factors in its passage, the concurrent resolution hardly qualifies as authority justifying their conduct. Significantly, the resolution itself states, "It is hereby established as the rule of the Legislature that no person shall be hired by the Legislature to engage solely in political campaign activity".

Defendants mischaracterize the issue when they rhetorically ask why legislative employees cannot "render active campaign support for political candidates while receiving a salary from the State." The obvious answer is that they can. But they may not be paid by the State for doing only campaign work or no work at all. It is for engaging in such conduct that defendants are being prosecuted.

Defendants claim that the Legislature has "carefully avoid-[ed] the attachment of criminal penalties to the conduct at issue" by not providing for such penalties in the Civil Service Law, the Election Law, the Legislative Law or the Public Officers Law. By this omission, they argue, the Legislature "manifested its intent to exclude such conduct from criminal prosecution." Defendants' argument is based on the false assumption that by virtue of their status as legislators and legislative employees and because their scheme involved the theft of public funds, only the Civil Service, Election, Legislative, and Public Officers Laws apply to their conduct.

Contrary to defendants' argument, there is no manifest intent to exempt legislators from criminal liability under the Penal Law. Furthermore, unless those more specific statutes explicitly provide otherwise, and they do not, a prosecutor has the discretion to apply the more general Penal Law. The Civil Service, Election, Legislative, and Public Officers Laws are narrowly constructed statutes with limited, albeit specific purposes. They were not intended to exempt elected officials or government employees from the Penal Law or to preclude criminal liability for the illegal conduct of those groups. The Penal Law, on the other hand, explicitly imposes criminal liability on everyone, legislators included, for certain conduct.

Defendants, who did not initially include the Civil Service Law when they first asserted this claim in their motion to dismiss, since the Civil Service Law does not apply to legislators and legislative employees, now argue that section 107,

which prohibits the appointment of employees in the civil service on the basis of political affiliation, somehow "demonstrate[s] the Legislature's intent not to criminalize the use of legislative employees in campaigns." The purpose of this section, as one court has noted, is to "separate the civil service of the State from the political obligations of the individual". *(People ex rel. Goldschmidt v Travis,* 167 App Div 475, 477.) Thus, the law was designed to eliminate political patronage in the civil service, thereby enabling the State to have a stable and independent body of employees. Although section 107 does not specifically prohibit the conduct at issue here, it cannot be argued that by such an omission the Legislature intended that city and State agencies could place on the civil service payroll employees who do no work. Similarly, it cannot be argued that legislators are permitted to do so.

As the motion court correctly found, the cited sections of the Election Law do not express an intention not to impose criminal sanctions for defendants' actions but instead are directed at specific evils. The Election Law's stated purpose is to "govern the conduct of all elections at which voters of the state of New York may cast a ballot". (Election Law § 1-102.) That the public moneys, allegedly stolen, were used to pay campaign workers does not transform any resultant criminality into the "conduct of an election."

Defendants point specifically to article 17 of the Election Law since it imposes criminal penalties for certain "Violations of the Election Franchise". As its title suggests, this article is directed at the purchasing of votes, interference with elections and corruption in the election process whereby political bosses attempted to insure the election of favored candidates. Subdivision (2) of section 17-154 ("Pernicious political activities") prohibits the promise of employment or compensation, "provided for or made possible in whole or in part by any act of congress or of the legislature appropriating funds for work relief", to any person in exchange for political activity or support of or opposition to any candidate. Defendants claim that by limiting the prohibition against political activity to funds appropriated for relief purposes, the Legislature manifested an intention not to impose criminal sanctions for similarly using the State payroll. But, clearly, no such intention is expressed. The statute is directed at a specific evil. Moreover, as further evidence that the Legislature never intended to preclude criminal sanctions, section 17-154 (2) was originally enacted as part of the Penal Law (L 1940, ch 667), and

expressly stated, "All provisions of this act shall be in addition to, not in substitution for, any other sections of existing law". Thus, there is nothing exclusive about section 17-154, or any other section of the Election Law.

Defendants also cite section 66-a of the Legislative Law as evidence that they are exempt from the Penal Law. This provision, found in an article entitled "Legislative Committees; Testimony in Legislative Proceedings", prohibits independent lobbying by legislative employees, and, as even its title makes plain, does not have any application to this case. Nor can it be used by analogy, since it does not purport to be an exclusive list of permissible or nonpermissible conduct for legislative employees. The section is meant to address a limited number of situations, none of which are here present.

In this connection, defendants' reliance on *People v Valenza* (60 NY2d 363) is misplaced. There, a vendor who failed to remit State sales taxes he had collected was prosecuted for larceny by embezzlement. The Tax Law, which the court found to be "an integrated statutory regulation that includes a comprehensive scheme of civil and criminal penalties" *(supra,* at 367), imposed a civil penalty for such conduct. Thus, the court held, because the Legislature had, in fact, addressed the very conduct at issue and had chosen to impose a civil penalty, there was evidence of "a manifest intent" to reject the imposition of a criminal penalty. Here, unlike *Valenza,* there is no evidence that the Legislature has chosen not to make defendants' conduct criminal. *People v Ortega* (69 NY2d 763), upon which defendants also rely, is similarly inapposite because the Legislature had addressed the issue being litigated in such a way as to evidence a deliberate exclusion.

It is axiomatic that, in the absence of any legislative limitation, the People are permitted to prosecute a defendant under either a general or specific statute when both criminalize the conduct at issue. *(People v Eboli,* 34 NY2d 281; *People v Sansanese,* 17 NY2d 302.)* Thus, even if the other cited statutes were to apply to this case, either directly or by analogy, there is nothing to support the claim that these statutes should apply exclusively.

In *People v Walsh* (67 NY2d 747), the Court of Appeals specifically reaffirmed this principle and clarified *People v Valenza* (60 NY2d 363, *supra)* to the extent that it might have been read to imply a contrary view. The *Walsh* court upheld the prosecution of a defendant for a felony under the Penal

Law even though his conduct was also classified as a misdemeanor under a separate regulatory statute. As *Walsh* makes clear, *Valenza* only precludes prosecution under the Penal Law when a regulatory statute reveals a legislative intent wholly to exclude a defendant's conduct from any criminal penalties. *(See also, People v Lacay,* 115 AD2d 450.)

As already noted, defendants also challenge the indictment on the ground that it is defectively drafted. Specifically, they argue that multiple false instrument counts based on a single payroll certification are multiplicious, and that, since the motion court agreed, it should have dismissed those counts. They further claim that the purportedly multiplicious counts do not state "other offenses", as required *(see,* CPL 200.20 [1]). Thus, they claim, the entire indictment must be dismissed as "hopelessly defective" since, pursuant to CPL 200.70 (2) (c), an indictment may not be amended to cure a misjoinder of offenses.

As already discussed, prohibition is available, only where there is a clear legal right and only when a court acts or threatens to act either in excess of its jurisdiction or, in a proceeding over which it has jurisdiction, in excess of its authorized powers. *(Matter of Holtzman v Goldman, supra,* 71 NY2d, at 569.) Errors properly reviewable on direct appeal are not collaterally reviewable by writ of prohibition. *(Matter of Maisonet v Merola,* 69 NY2d 965, *supra).*

The claimed defects are the type of errors not cognizable in an article 78 proceeding. *(See, e.g., Matter of Masin v County Ct.,* 97 AD2d 643 [article 78 will not lie to challenge trial court's denial of motion to dismiss indictment on sufficiency ground]; *Matter of Forte v Supreme Ct.,* 48 NY2d 179, 184, n 2 [article 78 will not lie where challenge is to perceived defect in indictment or proceedings; only a challenge to power of Grand Jury to indict is cognizable in such a proceeding].) Here, defendants do not challenge the power of the Grand Jury to indict, but, rather, only alleged defects in the indictment. Since defendants do not challenge the legality of the criminal proceeding, an article 78 does not lie. *(See, Matter of Maisonet v Merola, supra,* 69 NY2d, at 966.)[30] In any event, even if their claims were cognizable in an article 78 proceed-

---

**30.** *Matter of Gribetz v Edelstein* (90 AD2d 529, 530) is not to the contrary. There, the court held that article 78 relief will lie to challenge the amendment by the Trial Judge, over the People's objection, of an indictment by which the highest count of the amended indictment charged a lesser offense than that originally charged. In so holding, the court noted that only

ing, defendants would not be entitled to dismissal of the challenged counts since they were pleaded properly, and provide defendants with more than adequate notice of the crimes with which they are charged, as well as assure jury unanimity. Moreover, any pleading error is properly corrected at trial or after a verdict.

"An indictment may state in different counts the accomplishment of the crime charged in various ways as long as the facts relate to the same deed or transaction." *(People ex rel. Prince v Brophy,* 273 NY 90, 98; *People v Perrin,* 56 AD2d 957, 958.) Pleading in such a manner is permitted "where there may be doubt or uncertainty as to whether the facts and circumstances will show or do show one or the other to be the exact fact." *(People ex rel. Prince v Brophy, supra,* at 98.) The Federal rule is similar. Separately charged counts of a single crime are proper where each count requires proof of a fact that another count does not. *(See, e.g., United States v Reed,* 639 F2d 896.)

The indictment charges defendants with filing numerous payroll certifications, each containing numerous entries falsely certifying that employees performed legitimate legislative duties for the particular pay period involved. Each false entry in each certification has been charged as a separate count. Thus, as pleaded, the People must prove that each individual listed on a particular certification did not perform any legislative duties in the period covered by the certification. While all the counts relating to each certification charge the same crime, they "postulate different theories for the accomplishment of the crime" *(People v Perrin, supra,* 56 AD2d, at 958), since each of them involves a different employee. This is an acceptable form of pleading.

This conclusion is compelled by the policy considerations which underlie prosecution by indictment. As the Court of Appeals recently observed, " 'First and foremost, an indictment * * * provid[es] the defendant with fair notice of the accusations against him, so that he will be able to prepare a defense.' *(People v Iannone,* 45 NY2d 589, 594.) Second, the indictment prevents the prosecutor from usurping the powers of the Grand Jury by ensuring that the crime for which

the People could apply for an amendment to an indictment and that the Trial Judge's action could not be reviewed on direct appeal. Here, the motion court's striking of language from the conspiracy count is cognizable on direct appeal. *(Cf., People v Grega,* 72 NY2d 489.)

defendant is tried is the same crime for which he was indicted, 'rather than some alternative seized upon by the prosecution in light of subsequently discovered evidence.' * * * Finally, an indictment prevents later retrials for the same offense in contravention of the constitutional prohibition against double jeopardy". *(People v Grega,* 72 NY2d 489, 495-496.) Thus, CPL 200.30 (1) specifically bars duplicitous counts, providing that each count of an indictment may charge only a single offense. Multiplicity, on the other hand, is not similarly barred. The false filing counts, as pleaded, protect defendants because they give effect to these concerns.

From a reading of the indictment, defendants are well aware of exactly which entries the People allege are false. Moreover, in order to convict on a particular count, the jury will have to conclude unanimously that the particular entry was false. If the People had alleged, in a single count, all of the false entries in a particular certification, the jury would merely have to agree that there was some falsehood in that certification. This would raise the specter that individual jurors might disagree as to the falsity of any one particular entry since, if all the jurors agree that there was at least one falsehood, even if not unanimous as to any particular falsity, they could still convict. Thus, the benefit to defendants from multiple count pleading is obvious.

In any event, even if the counts were improperly pleaded, the proper remedy is not dismissal at the pretrial stage. As the motion court noted, any prejudice to defendants from a multiplicity of counts can be cured by appropriate jury instructions or by imposing concurrent sentences.[31] Indeed, in *People v Perrin* (56 AD2d 957, *supra),* the court recognized that the indictment was not defective because it charged two different theories of a single crime, even though it dismissed one of the two counts after conviction. This is precisely the remedy suggested in *People v Smith* (113 AD2d 905) and is sufficient to cure any possible harm to defendants.

Defendants, however, suggest that there is indeed a statutory bar to multiplicious counts. Without citing a single case in support thereof, they argue that a multiplicious count must be barred because it does not state "[an]other offense" *(see,* CPL 200.20 [1]) and, thus, dismissal of the entire indictment is

---

31. Indeed, since the false filing counts arise from single criminal transactions, concurrent sentencing would probably be mandatory. *(See,* Penal Law art 70.)

warranted. Even if multiplicity were statutorily barred, dismissal of the entire indictment would not be the appropriate remedy. At most, defendants would be entitled to dismissal of one of the multiplicious counts. As already noted, however, *People v Perrin* (56 AD2d 957, *supra)* suggests that where, as here, factual differences exist in the proof of each count, multiple count pleading is proper.

Defendants also argue that the motion court improperly usurped the function of the Grand Jury by rewriting the conspiracy count to strike therefrom language relating to those counts which it dismissed. As a result, they claim, the conspiracy charge must be dismissed. Since, in my view, the dismissed counts should be reinstated, as originally charged, thus rendering the amendment unnecessary, this argument is academic.

Accordingly, the order dismissing and amending certain counts of the indictment should be modified to the extent of reinstating said counts as originally charged, except as to defendant Quattrociocchi, and, except as thus modified, affirmed. The article 78 petition should be denied and dismissed.

MURPHY, P. J., ELLERIN and RUBIN, JJ., concur; SULLIVAN, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on or about June 15, 1988, affirmed; and application for a writ of prohibition, granted, to the extent that respondents are prohibited from prosecuting the petitioners under indictment No. 10173/87 as to those counts that relate to Category 3 employees, and otherwise denied, without costs and without disbursements, as indicated in this court's order.